UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DENHOLLANDER, et al.,

       Plaintiffs,

v.

MICHIGAN STATE UNIVERSITY, et al.,

       Defendants.

Lead Case No. 1:17-cv-00029

HON. GORDON J. QUIST

CONSOLIDATED CASES

| | |
|---|---|
| 1:18-cv-00773-GJQ-ESC | 1:18-cv-01016-GJQ-ESC |
| 1:18-cv-00806-GJQ-ESC | 1:18-cv-01018-GJQ-ESC |
| 1:18-cv-00828-GJQ-ESC | 1:18-cv-01025-GJQ-ESC |
| 1:18-cv-00829-GJQ-ESC | 1:18-cv-01027-GJQ-ESC |
| 1:18-cv-00831-GJQ-ESC | 1:18-cv-01038-GJQ-ESC |
| 1:18-cv-00886-GJQ-ESC | 1:18-cv-01042-GJQ-ESC |
| 1:18-cv-00913-GJQ-ESC | 1:18-cv-01045-GJQ-ESC |
| 1:18-cv-00915-GJQ-ESC | 1:18-cv-01046-GJQ-ESC |
| 1:18-cv-00944-GJQ-ESC | 1:18-cv-01047-GJQ-ESC |
| 1:18-cv-00968-GJQ-ESC | 1:18-cv-01056-GJQ-ESC |
| 1:18-cv-00982-GJQ-ESC | 1:18-cv-01057-GJQ-ESC |
| 1:18-cv-00987-GJQ-ESC | 1:18-cv-01058-GJQ-ESC |
| 1:18-cv-00993-GJQ-ESC | 1:18-cv-01060-GJQ-ESC |
| 1:18-cv-00995-GJQ-ESC | 1:18-cv-01169-GJQ-ESC |
| 1:18-cv-01005-GJQ-ESC | 1:18-cv-01258-GJQ-ESC |
| 1:18-cv-01006-GJQ-ESC | 1:19-cv-00178-GJQ-ESC |
| 1:18-cv-01010-GJQ-ESC | 1:19-cv-00440-GJQ-ESC |
| 1:18-cv-01012-GJQ-ESC | 1:19-cv-00579-GJQ-ESC |

**PLAINTIFFS' JOINT OMNIBUS BRIEF IN OPPOSITION TO MSU DEFENDANTS'
JOINT OMNIBUS MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES………………………………………………………v-xxii

INTRODUCTION………………………………………………………………………1

SUMMARY OF COMMON FACTS…………………………………………………..3

STANDARD OF REVIEW……………………………………………………………..9

ARGUMENT…………………………………………………………………………..10

I. PLAINTIFFS WITHDRAWS THOSE CLAIMS SUBJECT TO A 11TH IMMUNITY DEFENSE……………………………………………………………………...10

II. THIS COURT SHOULD ABSTAIN FROM DECIDING THE IMPORTANT STATE LAW ISSUES PRESENTED AND STAY THE PRESENT ACTION UNTIL THOSE ISSUES ARE DECIDED IN THE PARALLEL STATE-COURT LITIGATION………………..11

III. NO NOTICE REQUIREMENT EXISTS WHICH BARS CLAIMS AGAINST DEFENDANTS…………………………………………………………………..14

IV. IMMUNITY DOES NOT INSULATE THE INDIVIDUAL MSU DEFENDANTS FROM LIABILITY FOR THEIR TORTIOUS CONDUCT AND VIOLATIONS OF THE CHILD PROTECTION LAW……………………………………………………………16

V. PLAINTIFFS HAVE SUFFICIENTLY PLED TITLE IX LIABILITY……………………21

  A. Plaintiffs Have Sufficiently Plead Title IX Standing………………………………22

  B. Courts Recognize that Non-Students Have Standing to Bring Title IX Claims…….23

  C. Plaintiffs Plausibly Pled They Reported to Appropriate Persons……………………26

  D. Plaintiffs Plausibly Pled that MSU Was Deliberately Indifferent to Known Harassment………………………………………………………………………..30

VI. PLAINTIFFS STATED VIABLE ACA CLAIMS………………………………………32

VII. PLAINTIFFS PLED PLAUSIBLE SECTION 1983 CLAIMS……………………………34

  A. The Complaint Sufficiently States a Claim for Government Defendants' Violation of Plaintiffs' Fundamental Constitutional Right to Bodily Integrity…………………35

  B. The Complaint Sufficiently States a Claim for Government Defendants' Violation of Plaintiffs' Fundamental Constitutional Right to Be Free From State-Created Danger………………………………………………………………………...38

C.  Plaintiffs Alleged a Plausible Claim for Supervisory Liability……………………41

VIII.    PLAINTIFFS PLED A PLAUSIBLE CLAIM FOR VIOLATION OF THE TVPA………42

A.  Plaintiffs alleged each element to establish this claim, including Defendants' Participation in a Venture……………………………………………………………..43

B.  Claims That Accrued Prior to 2008 Are Not Barred………………………………44

IX.     PLAINTIFFS PROPERLY ALLEGED PLAUSIBLE VIOLATIONS OF ELLIOTT-LARSEN………………………………………………………………………………45

X.      PLAINTIFFS PROPERLY PLED VIOLATIONS OF THE CHILD PROTECTION ACT……………………………………………………………………………………50

A.  Plaintiffs Have Standing to Pursue A CPL Claim…………………………………..50

B.  The CPL Applies to Plaintiffs' Allegations…………………………………………54

i.       Suspected abuse triggers the duty to report…………………………………54

ii.      Defendants were mandated child abuse reporters by law…………………...55

iii.     Defendant Nassar perpetrated child abuse…………………………………..55

XI.     PLAINTIFFS' CLAIMS ARE NOT TIME-BARRED………………………………..57

A.  Plaintiff's Claims Accrued When They Learned OF MSU's Deception……………58

B.  Minor Plaintiffs' Claims Are Timely Under MCL 600.5851 As Are Claims Filed Before One-Year of Majority……………………………………………………….59

C.  Plaintiffs' Claims Are Timely Under MCL 600.5851b…………………………..60

D.  Plaintiffs' Claims Are Timely Under MCL 600.5855………………………………64

XII.    PLAINTIFFS' COMMON LAW CLAIMS ARE PROPERLY AND PLAUSIBLY PLED………………………………………………………………………………..68

A.  Plaintiffs Have Adequately Alleged Legal Duties for Negligence-Based Claims………………………………………………………………………………69

B.  Plaintiffs Have Pled Intentional Infliction of Emotional Distress…………………..72

C.  Plaintiffs Have Pled Negligent Infliction of Emotional Distress……………………74

D.  Plaintiffs Have Adequately Pled Claims of Fraud and Misrepresentation………… 75

E.  Invasion of Privacy…………………………………………………………………… 78

F.  Vicarious Liability…………………………………………………………………..78

CONCLUSION……………………………………………………………………………..79

## TABLE OF AUTHORITIES

*Abbo v. Wireless Toyz Francise, LLC,*

    2014 Mich. App. LEXIS 846, *22 (May 13, 2014) ....................................................... 77

*Adair v. Hunter,*

    236 F. Supp. 3d 1034 (E.D. Tenn. 2017) ..................................................................... 42

*Adams v. Ohio State University,*

    300 F.Supp.3d 983 (S.D. Ohio 2018) ........................................................................... 30

*Albright v. Oliver,*

    510 U.S. 266 (1994) ..................................................................................................... 35

*Anderson v. USAA Cas. Ins. Co.,*

    221 F.R.D. 250 (D.D.C. 2004) ..................................................................................... 76

*Anzaldua v. Band,*

    457 Mich 530 (1998) .................................................................................................... 20

*Ashcroft v. Iqbal,*

    556 U.S. 662 (2009) ....................................................................................................... 9

*Barrett v. Breault,*

    275 Mich. App. , 267 N.W. 544 (1936) ...................................................................... 65

*Baynes v. Cleland,*

    799 F.3d 600 (6th Cir. 2015) ....................................................................................... 37

*Bishop v. Children's Ctr. for Developmental Enrichment,*

    618 F.3d 533 (6th Cir. 2010) ....................................................................................... 58

*Briggs v. Oakland Cnty.,*

    276 Mich. App. 369 (2007) .......................................................................................... 19

*Brown v. Joiner Int'l Inc.*,

    523 F. Supp. 333 (S.D. Ga. 1981) ....................................................................76

*Browning v. Burt*,

    613 N.E.2d 993 (Ohio 1993) ..........................................................................59

*Bryant v. Oakpointe Villa Nursing*,

    *Cntr.,* 471 Mich. 411 (2004) ....................................................................19, 78

*Buhl v. City of Oak Park*,

    2019 WL 4126130 (Aug. 29, 2019) ................................................................61

*Burford v. Sun Oil Co.,*

    319 U.S. 315 (1943) ......................................................................................11

*Campbell v. Dundee Cmty Sch,*

    2015 US Dist LEXIS 85462 (ED Mich 2015) ................................................20

*Carter v. Michigan State Police*,

    2019 WL 846106 (2019) ................................................................................16

*Chambers v Trettco,*

    463 Mich 297 (2000) ................................................................................45, 47

*Clark v. United Parcel Serv, Inc,*

    400 F3d 341 (6th Cir 2005) ............................................................................48

*Colbert v. Conybeare Law Office*,

    239 Mich. App. 608 (2000) ..............................................................68, 69, 70

*Coley v. Lucas Cty., Ohio*,

    799 F.3d 530 (6th Cir. 2015) ..........................................................................41

*Colo River Water Conservation Dist v. United States*,

    424 U.S. 800 (1976) ........................................................................10, 11, 12

Complaints also specifically allege that in 2004, Kyle Stephens–then,

11 or 12......................................................................................................................................51

*Cox ex rel Cox v. Bd. of Hosp. Managers for City of Flint*,

467 Mich. 1 (2002)......................................................................................................70

*Crawley v. Hamilton County Comm'rs*,

744 F.2d. 28 (6th Cir. 1984)........................................................................................12

*Cty. of Sacramento v. Lewis*,

523 U.S. 833 (1998) .....................................................................................................34

*Culp v. Rutledge*,

343 F. App'x 128 (6th Cir. 2009) ...............................................................................42

*Daley v. La Croix*,

384 Mich. 4 (1970).......................................................................................................74

*Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*,

526 U.S. 629 (1999) ...............................................................................................23, 25

*De Haan v. Winter*,

258 Mich. 293, 241 N.W. 923 (1932) .........................................................................65

*Depyper v. Safeco Ins. Co. of America*,

232 Mich. App. 433, 591 N.W.2d 344 (1998) ...........................................................63

*Detroit Fire Fighters Ass'n v. Detroit*,

449 Mich 629, 537 NW2d 436 (1995) ........................................................................53

*Dockweiler v Wentzell*,

425 NW 2d 468 (1988)................................................................................................47

*Doe v. Borromeo*,

2012 Mich. App. LEXIS 1821, at *12 (Ct. App. Sep. 20, 2012) ..................................70

*Doe v. Brown Univ*.,

   896 F.3d 127 (1st Cir. 2018) ......................................................23, 24, 25, 26

*Doe v. Claiborne Cty*.,

   103 F.3d 495 (6th Cir. 1996)................................................................35, 41

*Doe v. Department of Transportation*,

   324 Mich. App. 226 (2018) .................................................................15, 16

*Doe v. Doe*, Nos. 307420, 310019,

   2019 Mich. App. LEXIS 2386, at *13 (Ct. App. Dec. 4, 2014)....................................71

*Doe v. Farmer,*

   2009 WL 3768906 (M.D. Tenn. November 9, 2009) ...................................28

*Doe v. Hamilton County Board of Education*,

   329 F.Supp.3d 543 (E.D. Tenn. 2018) ......................................................29

*Doe v. Mills*,

   212 Mich. App. 73, 536 N.W.2d 824 (1995) ..............................................78

*Doe v. Roman Catholic Archbishop of Archdiocese of Detroit*,

   264 Mich. App. 632 (2004) .................................................................60, 61

*Estate of Qing Kong v. A.J. Marshall Co.*,

   233 Mich. App. 229 (1998).......................................................................71

*Estate of Smith v. Marasco*,

   318 F.3d 497 (3d Cir. 2003)......................................................................39

Fair Assessment [in Real *Estate Ass'n v McNary*],

   454 U.S. [100,] , 102 S. Ct. 177, 70 L. Ed. 2d 271 .....................................11

*Fortenberry v. Jenkins-Dick Corp*.,

   No. 242225, 2003 WL 22849770 (Mich. Ct. App. Dec. 2, 2003)..................49

*Fowler v. Benson*,

    924 F3d 247 (6th Cir. 2019) ........................................................................... 13

*Franks v. Kentucky School for the Deaf*,

    142 F3d 360 (6th Cir 1998) ............................................................................ 10

*Fultz v. Union-Commerce Assocs.*,

    470 Mich. 460 (2004) ..................................................................................... 71

*Galvin v McCarthy*,

    545 F. Supp. 2d 1176 (D. Colo. 2008) ........................................................... 76

*Gebser v. Lago Vista Indep. Sch. Dist.*,

    524 U.S. 274 (1998) ....................................................................................... 22

*Gilbert v. United States Olympic Comm.*,

    2019 WL 4727636 (D. Colo 9/27/2019) ........................................................ 43

*Gilbert v. USOC*,

    2019 WL 1058194 (D Colo 2019) ....................................................... 43, 44, 45

*Gillespie v. City of Battle Creek*,

    100 F.Supp 3d 623 (WD MI 2015) ................................................................. 75

*Ginsberg v. New York*,

    390 U.S. 629 (1968) ....................................................................................... 50

*Golden v. City of Columbus*,

    404 F.3d 950 (6th Cir. 2005) .......................................................................... 27

*Grawey v. Drury*,

    567 F.3d 302 (6th Cir. 2009) .......................................................................... 37

*Groening v. Opsata*,

    323 Mich. 73 (1948) ....................................................................................... 77

ix

*Guertin v. State*,

    912 F.3d 907 (6th Cir. 2019) ........................................................................................35

*Gunesekera v. Irwin*,

    551 F.3d 461 (6th Cir. 2009) ..................................................................................18, 21

*Hawthorne-Burdine v. Oakland University*,

    2018 WL 1832336 (Mich Ct App April 17, 2018) ......................................................14

*Helder v. North Pointe Ins. Co.*,

    234 Mich. App. 500, 595 N.W.2d 157 (1999) ...........................................................63

*Hersh v. Kentfield Builders, Inc.*,

    385 Mich. 410 (1971) ..................................................................................................70

*Hiltz v. Phil's Quality Market*,

    417 Mich 335, 337 NW2d 237 (1983) .......................................................................52

*Hord v. Environmental Research Inst.*,

    463 Mich. 399 (2000) ..................................................................................................77

*Howard v. Knox Cty*,

    695 F. App'x  107 (6th Cir. 2017) ..............................................................................42

*Hurley v. Atlantic City Police Dep't*,

    174 F.3d 95 (3d Cir. 1999) .........................................................................................49

*Hyde v. Univ. of Michigan Bd. of Regents*,

    426 Mich. 223, 393 N.W.2d 847 (1986) ....................................................................19

*Id.* at 65, 74,

    903 N.W.2d 366 .........................................................................................................18

In re *Arctic Exp. Inc.*,

    636 F.3d .......................................................................................................................59

*In re Certified Questions*,

    416 Mich. 558 (1982) ............................................................................ 62

*In re Gazella*,

    264 Mich App 668 (2005) ...................................................................... 52

*In re Hansen*,

    285 Mich App 158 (2009) ...................................................................... 53

*In re Jenks*,

    281 Mich. App. 514 ................................................................................ 52

*In re Wood Estate*,

    374 Mich. 278, 132 N.W.2d 35 (1965) ....................................... 65, 69, 70

*Jackson v. Quanex*,

    191 F3d 647 (6th Cir 1999) ................................................................... 48

*Jackson v. Saginaw Co*,

    458 Mich. 141 (1998) ............................................................................ 18

*Johnson v. Harris*,

    2009 WL 3126315 (E.D. Mich. Sept. 28, 2009) .................................... 41

*Jones v. Bitner*,

    300 Mich App 65 (2013) ........................................................................ 20

*K.T. v. Culver-Stockton Coll.*,

    865 F.3d 1054 (8th Cir. 2017) ......................................................... 23, 26

*Kallstrom v. City of Columbus*,

    136 F.3d 1055 (6th Cir. 1998) ............................................................... 40

*Karpinsky v. St. John Hosp. – Macomb Ctr. Corp.*,

    238 Mich. App. 539, 606 N.W2d 45 (1999) ......................................... 63

*Kehoe Component Sales Inc. v. Best Lighting Prods., Inc.,*

    933 F. Supp. 2d 974 (S.D. Ohio 2013) ......................................................... 59

*Kerotest [Mfg. Co. v. C-O-Two Fire Equipment Co.],*

    342 U.S. [180,] , 72 S.Ct. 219 .................................................................... 12

*King-White v. Humble Indep. Sch. Dist.,*

    803 F.3d 754 (5th Cir. 2015) ...................................................................... 58

*Kneipp v. Tedder,*

    95 F.3d 1199 (3d Cir. 1996) ....................................................................... 39

*Kovacevich v. Kent State Univ,*

    224 F3d 806 (CA 6, 2000) .......................................................................... 10

*Kroll v. Vanden Berg,*

    336 Mich 306, 57 N.W.2d 897 (1953) ......................................................... 65

*KS v Detroit Public Schools,*

    2015 WL 4459340 (ED Mich 2015) ............................................................ 47

*Kuhn v. Secretary of State,*

    228 Mich App 319, 579 NW2d 101 (1998) .................................................. 53

*Landgraf v. USI Film Products,*

    511 U.S. 244 (1994) .................................................................................. 44

*Levin v. Commerce Energy, Inc.,*

    560 U.S. 413 (2010) .................................................................................. 11

*Lewis v. Legrow,*

    258 Mich. App. 175 (2003) ........................................................................ 72

*Lincoln Nat'l Bank v. Lampe,*

    414 F. Supp. 1270 (N.D. Ill. 1976) ............................................................ 76

*Linebaugh v. Sheraton Michigan Corp*,

    198 Mich. App. 335 (1993) ............................................................................................72

*Lipiec v. United States*,

    2015 WL 4886585 (E.D. Mich. Aug. 17, 2015) ............................................................9

*Loewen v. Grand Rapids Med. Educ. Partners*,

    2012 WL 1190145 (W.D. Mich. Apr. 9. 2012) ....................................................24, 25

*Louisiana Power & Light Co. v. City of Thibodaux*,

    360 U.S. 25 (1959) ......................................................................................................11

*Lucero v. Dept of Corrections*,

    2015 Mich App LEXIS 500 (2015) ..............................................................................20

*Lumber Village Inc. v. Siegler*,

    135 Mich. App. 685, 355 N.W.2d 654 (1984) .......................................................65, 77

*Lutz v. Chesapeake Appalachia LLC*,

    717 F.3d 459 (6th Cir. 2013) ......................................................................................66

*M&D, Inc. v. McConkey*,

    231 Mich. App. 22(1998) .............................................................................................77

*Mack v. City of Detroit*,

    467 Mich. 189, 649 N.W.2d 47 (2002) .......................................................................17

*Maiden v. Rozwood*,

    461 Mich. 109, 597 N.W.2d 817 (1999) .....................................................................17

*Maldonado v. National Acme Co*,

    73 F.3d 642 (6th Cir. 1996) ........................................................................................75

*McCluskey v. Womack*,

    188 Mich. App. 465, 470 N.W.2d 443 (1991) ............................................................64

*McCoy v. Bd. of Educ., Columbus City,*

    *Schs.*, 515 F. App'x 387 (6th Cir. 2013) ........................................................... 30, 31, 32

*McGahan v. Brennan,*

    822 NW2d 747 (2012) .......................................................................................... 14

*McKinley v. City of Mansfield*,

    404 F.3d 418 (6th Cir.2005) ................................................................................. 42

*McQueen v. Beecher Community Schools*,

    433 F.3d 460 (6th Cir. 2006) ................................................................................ 40

*Michigan S. R.R. Co. v. Branch & St. Joseph Ctys. Rail Users Ass'n., Inc.,*

    287 F.3d 568 (6th Cir. 2002) ................................................................................. 9

*Morse v. Lower Merion Sch. Dist.*,

    132 F.3d 902 (3d Cir. 1997) ................................................................................. 40

*Muglia v. Kaumagraph Corp.*,

    64 F.3d 663 (6th Cir. Aug. 16, 1995) .................................................................. 66

*Munger v. City of Glasgow Police Department*,

    227 F.3d 1082 (9th Cir. 2000) .............................................................................. 39

*Murdock v. Higgins*,

    454 Mich 46; 559 NW2d 639 (1997) ............................................................... 50, 71

*Musson Theatrical, Inc. v. Fed Exp.,*

    89 F.3d 1244 (6th Cir. 1996) ................................................................................. 9

*N. Haven Board of Education v. Bell*,

    456 U.S. 512 (1982) .......................................................................................... 26, 27

*Nation v W.D.E. Electric Company,*

    454 Mich 489 (1997) ............................................................................................ 52

*Nat'l RR Passenger Corp v. Morgan,*

    536 US 101 (2002) ............................................................................................48

*Neal v MDOC,*

    2009 WL 187813 (Mich App 2009) ...................................................................47

*Newsom v. Vanderbilt Univ,*

    653 F.2d. 1100 (6th Cir. 1981) ...........................................................................11

*Nowicki v. Podgorski,*

    359 Mich. 18 (1960) ..........................................................................................77

*Odom v. Wayne Co.,*

    482 Mich. 459 (2008) ..................................................................................17, 21

*PaineWebber, Inc. v. Cohen,*

    276 F3d 197 (6th Cir. 2001) ........................................................................12, 13

*Patterson v. Hudson Area Sch.,*

    551 F.3d 438 (6th Cir. 2009) ..............................................................................32

*Peatross v. City of Memphis,*

    818 F.3d 233 (6th Cir. 2016) ..............................................................................41

*Penilla v. City of Huntington Park,*

    115 F.3d 707 (9th Cir. 1997) ..............................................................................39

*People v. Beardsley,*

    263 Mich App 408  (2004) .................................................................................50

*People v. Cavaiani,*

    172 Mich App 706 .............................................................................................55

*Perez v. Ford Motor Co 2,*

    006 WL 1540764 (1996) ....................................................................................48

*Phila. Indem. Ins. Co. v. Youth Alive, Inc.*,

    732 F.3d 645 (6th Cir. 2013) ................................................................................9

*Phillips v. Deihm*,

    213 Mich App 389 (1995) .................................................................................51

*Piotrowski v. City of Houston*,

    237 F.3d 567 (5th Cir. 2001) .............................................................................58

*Plamp v. Mitchell Sch. Dist.*,

    565 F3d 450 (8th Cir. 2009) ..............................................................................29

*Planned Parenthood of Se. Penn. v. Casey*,

    505 U.S. 833 (1992) ..........................................................................................36

*Powers v. Hamilton Cnty. Pub. Defender Comm'n*,

    501 F.3d 592 (6th Cir.2007) ..............................................................................42

*Radtke v Everett*,

    442 Mich 368 (1993) ...................................................................................45, 46

*Railroad Comm'n of Tex. v. Pullman Co.*,

    312 U.S. 496 (1941) ..........................................................................................11

*Ratliff v. Gen. Motors Corp.*,

    127 Mich. App. 410 (1983) ...............................................................................75

*Ray v. Swager*,

    *on remand,* 321 Mich. App. 755 (2017) ..........................................................18

*Reilly v. Vadlamudi*,

    680 F.3d 617 (6th Cir. 2012) ...............................................................................9

*Richards v. Minnesota*,

    2016 WL 818657 (D Minn 2016) .....................................................................34

*Riverside Auto Sales, Inc. v. GE Capital Warranty Corp.*,

    No. 2:03 CV 55, 2004 WL 2106638 (W.D. Mich. Mar. 30, 2004)..........................................65, 70

*Rochin v. California*,

    342 U.S. 165 (1952) .................................................................................................................34

*Romeo Community Schools v. United States Department of Health, Education, and Welfare*,

    438 F.Supp. 1021 (E.D. MI. 1977)...........................................................................................26

*Romine v. Compuserve Corp*,

    160 F.3d. 337 (6th Cir. 1998)....................................................................................................12

*Rosa H. v. San Elizario Indep. Sch. Dist.*,

    106 F.3d 648 (5th Cir. 1997).............................................................................................28, 29

*Rose v. Arkansas Valley Environmental Utility Authority*,

    562 F. Supp. 1180 (W.D. Mis. 1983) ......................................................................................76

*Rosengarten v. Buckley*,

    565 F. Supp. 193 (D. Md. 1982) ..............................................................................................76

*Ross v. Consumers Powers*,

    420 Mich 567(1984)..................................................................................................................21

*Sample v. Bailey*,

    409 F.3d 689 (6th Cir. 2005).....................................................................................................37

*Schmerber v. California*,

    384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) ..............................................................35

*Schneider v. Franklin Cty.*,

    288 F. App'x 247 (6th Cir. 2008)..............................................................................................38

*Schroder v. City of Fort Thomas*,

    412 F.3d 724 (6th Cir. 2005).....................................................................................................40

*SEC v. Tiffany Industries, Inc*.,

    535 F. Supp. 1160 (E.D. Mo. 1982) ............................................................76

*Sharp v. City of Houston*,

    164 F3d 923 (5th Cir 1999) ....................................................................48

*Sheridan v. Forest Hills Pub Sch*,

    247 Mich App 611 (2001) ................................................................47, 48

*Sills v. Oakwood Hosp.*,

    220 Mich. App. 303, 559 N.W.2d 348 (1996) ............................................65

*Sowers v. Bradford Area Sch. Dist.*,

    694 F. Supp. 125 (W.D. Pa. 1988) ...........................................................58

*Standard Fire Ins Co. v. Ford Motor Co.*,

    723 F.3d 690 (6th Cir. 2013) ..................................................................75

*State of Ohio ex rel. Fisher v. Louis Trauth Dairy, Inc.*,

    856 F. Supp. 1229 (S.D. Ohio 1994) ..................................................66, 68

*Steckloff v. Wayne State University*,

    2019 WL 2929185 (ED Mich 2019) ....................................................14, 15

*Stiles ex rel. D.S. v. Grainger Cty*,

    819 F.3d 834 (6th Cir. 2016) ..............................................................28, 38

*Stites v. Sundstrand Heat Transfer, Inc*,

    660 F. Supp. 1516 (W.D. Mich. 1987) .....................................................75

*T.R. v. Boy Scouts of Am.*,

    181 P.3d 758 (Or. 2008) .........................................................................59

*Tackett v. Marion County Fair Bd.*,

    272 F. Supp. 2d 686 (6th Cir. 2003) .........................................................58

*Tarlea,*

    263 Mich. App.........................................................................................................17, 18

*Terry v. Tyson Farms,*

    604 F.3d 272 (6th Cir. 2010).............................................................................9

*Theophelis v. Lansing Gen. Hosp.,*

    430 Mich. 473 (1988)........................................................................................70

*Tonegatto v. Budak,*

    112 Mich. App. 575, 316 N.W.2d 262 (1982) .............................................65

*Trainor v. Hernandez,*

    431 U.S. 434 (1977) ............................................................................................11

*Travelers Indem. Co. v. Bowling Green Prof'l Assocs., PLC,*

    495 F.3d 266 (6th Cir. 2007)............................................................................12

*Twombly,*

    550 U.S..................................................................................................................50

*Union Pac. Ry. Co. v. Botsford,*

    141 U.S. 250, 11 S.Ct. 1000, 35 L.Ed. 734 (1891) ....................................35

*US Fidelity & Guaranty Co. v. Black,*

    412 Mich. 99 (1981).........................................................................................77

*Varnell v. Dora Consol. Sch. Dist.,*

    756 F.3d 1208 (10th Cir. 2014)......................................................................58

*Venture Glob. Eng'g, LLC v. Satyam Computer Servs., Ltd.,*

    730 F.3d 580 (6th Cir. 2013)...........................................................................66

*Washington v. Harper,*

    494 U.S. 210 (1990) ..........................................................................................35

*Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*,

    400 F.3d 360 (6th Cir. 2005) ........................................................................................ 41

*Williams v. Coleman*,

    194 Mich App 606 (1992) ............................................................................................ 20

*Wilson v City of Detroit*,

    2001 WL 760020 (2001) .............................................................................................. 47

*Woods v. MDOC*,

    2018 WL 1611444 (Mich App 2018) ........................................................................... 48

*Yan v. Pa. State Univ.*,

    2015 WL 3953205 (M.D. Pa. June 29, 2015) .............................................................. 26

*Younger v. Harris*,

    401 U.S. 37 (1971) ...................................................................................................... 11

*Younger v. Harris*,

    401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971) .................................................. 11


Regulations

18 USC § 1591, 1595 ........................................................................................................ 42

18 USCS Section 1595 (c)(2) ............................................................................................ 45

20 U.S.C. §1681 (a) ..................................................................................................... 22, 25

42 U.S.C. § 1983 .............................................................................................................. 78

42 USC § 18116 ............................................................................................................... 32

MCL § 37.2701(b) ............................................................................................................ 49

MCL § 691.1407(3) .......................................................................................................... 21

MCL § 72.633 (1) ............................................................................................................. 20

MCL § 722.621 ................................................................................................................. 19

MCL § 722.622(v)(ii) ................................................................................................51

MCL § 722.623 .................................................................................................54, 55

MCL § 722.633 ................................................................................................52

MCL § 722.633(1) ................................................................................................50

MCL 15.361 ................................................................................................20

MCL 37 ................................................................................................45

MCL 37.2103 ................................................................................................45

MCL 37.2103(i) ................................................................................................45

MCL 37.2103(iii) ................................................................................................46

MCL 37.2402 ................................................................................................46

MCL 600.2912b ................................................................................................19

MCL 600.5805(2) ................................................................................................61

MCL 600.5805(6) ................................................................................................13

MCL 600.5851 ................................................................................................iii, 59

MCL 600.5851b ................................................................................................iii, 13, 60

MCL 600.5851b (1) or (2) ................................................................................................57

MCL 600.5851b(1) ................................................................................................61

MCL 600.5851b(3) ................................................................................................58, 61

MCL 600.5855 ................................................................................................iii, 64

MCL 600.6421 (1) ................................................................................................15

MCL 600.6431(1) ................................................................................................16

MCL 660.5851 ................................................................................................57

MCL 691.1407 ................................................................................................16, 17

MCL 691.1407(4) ................................................................................................19

MCL 691.1407(8)(a) .................................................................................................. 17

MCL 691.1413 ............................................................................................................ 19

MCL 722.622 .............................................................................................................. 56

MCL 722.622(g) .......................................................................................................... 56

MCL 722.622(v)(i) ...................................................................................................... 57

MCL 722.622(v)(iii) .................................................................................................... 57

MCL 722.623(1)(a) ..................................................................................................... 55

MCL 750.520b ............................................................................................................ 63


Fed R Civ Pro 12(b)(6) ........................................................................................... 9, 27

Fed. R. Civ. P. 9(b) .................................................................................................... 76

34 CFR 106.1 .............................................................................................................. 22

34 CFR 106.31 ............................................................................................................ 22

34 CFR 106.31 (b) (5) ................................................................................................ 22

34 CFR 106.32 ............................................................................................................ 22

34 CFR 106.34 ............................................................................................................ 23

34 CFR 106.36 ............................................................................................................ 23

34 CFR 106.37 ............................................................................................................ 23

## INTRODUCTION

The Plaintiffs, whose claims are subject to the Defendants' Omnibus Motion to Dismiss, all endured repeated sexual assaults by Larry Nassar as young girls. The ramifications of this abuse will be felt through their lifetimes.

Between 1996 and 2016, Michigan State University (MSU) received at least 13 credible reports that sports medicine doctor, Lawrence G. Nassar was sexually assaulting, abusing and molesting young women and girls, including all of the Plaintiffs, under the guise of medical treatment and during the course of his employment. The MSU employees who received reports of Nassar's sexual assault "downplayed its seriousness or affirmatively discouraged the survivors from proceeding with their allegation" all of which contributed to the university's "culture of indifference and institutional protection" resulting in hundreds of women and girls being sexually abused.[1]

It is this very environment of institutional protection that resulted in the gross mishandling of the 2014 Amanda Thomashow Title IX Investigation. On April 21, 2014 Thomashaw reported to Dr. Jeffrey Kovan that Nassar rubbed her breast and vagina during a medical appointment to treat hip pain. The Title IX investigation was handled by Kristine Moore, an attorney and assistant director of MSU's Office of Inclusion, which investigated Title IX complaints. The University found that Nassar's treatment was an appropriate medical technique and not sexual in nature. Three independent investigations including the United States Department of Education, the Michigan Attorney General and the Michigan Attorney Grievance Commission have uniformly concluded that Moore's probe was "deficient" and violated federal regulations, including Title IX and the Clery Act. Because of Moore's failings, Nassar was permitted to return to work, and it has been reported that hundreds more

---

[1] Attorney General Investigation.

1

women and girls were sexually assaulted by Nassar until he was finally terminated in September 2016.

In late 2016 and early 2017, Nassar eventually pled guilty to sexually abusing several young (minor) girls over a nearly 20-year period. During Nassar's criminal sentencing, hundreds of young women provided Victim Impact Statements. Throughout this process, the MSU defendants continued to deny any knowledge of his sexual misconduct.

On May 16, 2018, MSU and attorneys for 333 women who were sexually assaulted by Nassar announced a settlement of $500 million. Of that amount, $425 million was placed in a qualified settlement fund which was distributed by a retired judge appointed as the Abuse Claims Evaluator. As part of that settlement, MSU agreed to waive their timeliness and immunity defenses which would have defeated many of the asserted claims. $75 million of the Settlement was set aside in a separate fund identified as the Litigation Reserve Amount. By this settlement, MSU finally acknowledged its culpability and role in Nassar's misconduct and their cover-up.

The Settlement required that the Michigan Legislature create a window for the revival of stale damage against Nassar, MSU and other responsible parties provided that:

a.  The victim was a minor at the time of the sexual assault by Nassar;

b.  The sexual assault occurred before June 12, 2016;

c.  The claim was filed in Court by September 10, 2016;

d.  The defendant was in a position of authority over the victim as the victim's physician and used that authority to coerce the victim to submit; and

e.  The defendant engaged in purported medical treatment or examination of the victim in a manner that is, or for purposes are, medically recognized as unethical or unacceptable.

Following the settlement and this passage of this legislation, these Plaintiffs and others filed cases, several of which are pending in the Western District of Michigan and subject of the Defendants' omnibus motion to dismiss.[2]

In their motion to dismiss, Defendants challenge the jurisdiction of the Court as well as the legal and factual[3] underpinnings of Plaintiffs' claims[4]. This attack based solely on the pleadings, before any discovery is conducted, is simply a further attempt to deflect and deny responsibility for their egregious conduct. Defendants should not be permitted to escape accountability for their role in this tragedy by prematurely challenging Plaintiffs' ability to prove their claims before discovery is even conducted. As explained below, Plaintiffs have pled plausible claims under both federal and state law. To the extent that claims are not withdrawn, Defendants' motion should be denied.

## SUMMARY OF COMMON FACTS[5]

From approximately 1996 to 2016, Nassar was employed by MSU as (a) Associate Professor, MSU's Division of Sports Medicine; (b) Team Physician, MSU's Men's and Women's Gymnastics Teams; (c) Team Physician, MSU's Men's and Women's Track Field Teams; (d) Team Physician, MSU's Men's and Women's Crew Teams; (e) Team Physician, MSU's Intercollegiate Athletics; (f)

---

[2] Many of the Plaintiffs have also filed claims in the Michigan Court of Claims and Ingham County Circuit Court

[3] Defendants also misrepresent the record in their continuing effort to conceal and deny the early notice that they had that Nassar was a sexual predator who they allowed to continue to have unfettered access to young women who unwittingly sought "medical treatment" from a nationally renown expert, who in reality was a serial sexual predator.

[4] Plaintiffs either amended their complaints or sought leave to amend to address concerns and deficiencies asserted by Defendants in their motion. Plaintiffs supplemented the allegations to add specificity as well as facts uncovered since the complaints were originally filed. The Court has held those amendments in abeyance.

[5] These facts have all been drawn from the complaints filed by the Plaintiffs. Since there are many separate complaints at issue. Plaintiffs have not cited to the individual complaints to support the allegations and facts contained in this statement of facts.

Medical Consultant at MSU's Wharton Center for the Performing Arts;(g) Advisor, Student Osteopathic Association of Sports; and (h) a physician at the Sports Medicine Clinic

While employed by MSU, Nassar also practiced medicine at USOC/ USAG sanctioned events worldwide, Twistars and the Karolyi Ranch. MSU promoted Nassar in an attempt to attract students and patients to the clinic by holding Nassar out as a renowned orthopedic sports medicine physician in the gymnastics community. In this capacity for over 20 years, Nassar had unrestricted and unmonitored access to young female athletes.

As early as 1997 and/or 1998, employees, and agents of MSU were made aware that Nassar was sexually assaulting his patients. MSU failed to appropriately respond to these allegations. Between 1997 and 2015, thirteen individuals made credible reports detailing Nassar's abuse to MSU employees at the time it was happening.[6]

In 1997 Larissa Boyce, while under the instruction of Kathie Klages and MSU Youth Gymnastics, informed MSU and Klages that Nassar sexually assaulted her on multiple occasions. Klages responded that she had known Nassar for years and could not imagine him doing that. Klages summoned Boyce's teammates and asked each one if they had similar complaints. When one of the teammates stated that Defendant Nassar also touched her inappropriately, Klages cleared the room. She pressured Boyce not to file a formal complaint telling her, "Well, I could file this but there's going to be very serious consequences for you and Nassar." Boyce's allegations went unaddressed, violating MSU's reporting policies and Title IX. Klages later misrepresented to the Michigan Attorney General's office that she did not recall receiving reports of Nassar's abuse prior to 2016. On August 23, 2018, Klages was indicted on one felony and one misdemeanor count, for lying about

---

[6] Michigan Attorney General's Report at p. 7-9.

whether she knew of Nassar's abuse.[7] Klages' response to Boyce's report became MSU's *modus operandi* for decades.

In 1998 or 1999 Jennifer Rood Bedford, an MSU student athlete on the volleyball team reported that Nassar was commonly known as the "crotch doc" and "happy fingers" because of his unconventional methods of treating back and hip pain. After Rood Bedford was abused, she informed MSU athletic trainer Lianna Hadden that she wanted to file a report. Beford ultimately did not file a complaint.[8] MSU employee, trainer Destiny Teachnor-Hauk, told Bedford that Nassar's treatment was medical, not criminal. Teachnor-Hauk warned Bedford that if she pursued the matter further that it would burden her family and cause her a lot of trauma. Teachnor-Hauk also questioned why Bedford would want to drag Nassar through an allegation of sexual assault.

In approximately 1999/2000, when MSU track and cross-country athlete reported to her coach that Nassar penetrated her, the coach explained that Nassar was "an Olympic doctor and he should know what he is doing."[9] Likewise, when a MSU softball athlete reported to her trainer that Nassar had inserted his fingers into her during treatment, the trainer responded that Nassar was a world-renowned doctor performing legitimate treatment. The other supervising trainers responded similarly.[10]

In 2004, MSU employee Gary E. Stollak, a clinical psychologist, was notified that Nassar had been sexually abusing the child of a family friend in his home for many years, 11 year old Kyle Stephens.[11] Stollak failed to report the abuse to law enforcement or to child protective services and was forced to surrender his psychology license.

---

[7] Ropes & Gray LLP Report at p. 49-50.
[8] Ropes & Gray LLP Report at p. 50-51; DOE Report p. 7.
[9] Ropes & Gray LLP Report at p. 50.
[10] Ropes & Gray LLP Report at p. 50; DOE Report p. 7.
[11] Ropes & Gray LLP Report at p. 51.

MSU's conduct and repeated failure to take reports seriously was criticized in the December 21, 2018 Michigan State Attorney General's Office report following the Independent Special Counsel's investigation into Defendant Nassar's sexual conduct and MSU's cover-up. The investigation concluded that MSU created a "culture of indifference toward the health and safety of MSU students and faculty." And that MSU employees who received reports of Nassar's sexual assault or improper medical treatment downplayed the seriousness of the incident or affirmatively discouraged the survivors from proceeding with their allegation. [12]  The report concluded:

> When faced with accusations of digital penetration during routine medical treatments—serious allegations that amount to criminal wrongdoing—the MSU employees discounted the young woman's story and deferred to Nassar, the world-renowned sports medicine doctor.

In 2014 MSU failed to conduct a proper Title IX investigation when Amanda Thomashow reported that Nassar assaulted her.  Thomashow sought treatment with Nassar.  During her appointment she was sexually abused by Nassar when he cupped her buttocks, massaged her breast and vaginal area, and became sexually aroused.  Thomashow tried to stop the assault by telling Nassar that he was hurting her.  He responded that he was "almost done."  Nassar then stood in the corner of the room for between 30 to 45 seconds.  Thomashow thought he was hiding an erection.  After her appointment she told the receptionist at the Sports Medicine Clinic that she wanted to cancel her next appointment because Nassar made her feel "uncomfortable."[13]  MSU investigated Thomashow's complaints through its Office of Institutional Equity (OIE), omitting critical facts from the report including the fact that Nassar was sexually aroused while touching her and that the appointment with Nassar did not end until Thomashow physically removed his hands from her body.  Three months after initiating the investigation, her complaint was dismissed.  MSU  concluded  that Thomashow

---

[12] Michigan Attorney General's Report at p. 10.
[13] Ropes & Gray LLP at p. 52-53; DOE Report p. 11; Michigan Attorney General's Report at p. 10.

did not understand the "nuanced difference" between sexual assault and an appropriate medical procedure, deeming Nassar's conduct "medically appropriate" and "[n]ot of a sexual nature."[14] During the pendency of MSU's OIE investigation, Nassar continued to treat approximately 249 patients.[15]

On July 30, 2014, Defendant Strampel, the Acting Dean of the MSU School of Osteopathic Medicine, sent an e-mail to Nassar that set new institutional guidelines, restricting Nassar from examining/treating patients alone and required him to be accompanied by a chaperone such as a resident or nurse; the "procedure" was to be altered to ensure there would be little to no skin to skin contact when in certain "regions" and if skin to skin contact was "absolutely necessary" the "procedure" was to be explained in detail with another person in the room for both the explanation and the "procedure;" and, new people in the practice were to be "oriented" to ensure understanding with the guidelines.  Nassar did not adopt this protocol and because MSU failed to supervise or oversee to ensure that Nassar was adhering to these conditions, from July 2014 to September 2016, Nassar continued to have unfettered access to female athletes.

On September 1, 2016 Rachel Denhollander[16] filed a complaint with MSU's Title IX office alleging that Nassar assaulted her during a medical appointment in 2000 at the MSU Sports Medicine Clinic.  Not until Denhollander's complaints were made public by the media on September 12, 2016 did MSU take any action and merely sent Nassar a letter stating his employment was being considered for termination.[17]

_____

[14] DOE Report p. 13-15.
[15] DOE Report at p. 10-11.
[16] Although Defendants' timeline and factual statement infer that Denhollander's complaint was the first notice to MSU of Nassar's misconduct, that is patently false and ignores the public record as well as the detailed allegations in the Plaintiffs' complaints.
[17] DOE Report at p. 15.

On September 5, 2019 the US Department of Education Office for Civil Rights (OCR) released the results of its investigation of MSU's Title IX compliance regarding Nassar. OCR determined that MSU violated Title IX because it failed to appropriately respond to reports alleging sexual harassment perpetrated by Nassar and the Dean and failed to take appropriate actions reasonably calculated to end the harassment, eliminate the hostile environment, and prevent the harassment from recurring.[18] After its investigation, OCR also concluded that MSU failed to respond appropriately to the 2014 Thomashow complaint and its failure caused the victim to be subjected to a sexually hostile environment. In light of the danger posed by Nassar, MSU also failed to take actions to eliminate any sexually hostile environment created by Defendant Nassar for other students.[19]

Likewise, the Report of the Independent Special Counsel appointed by the Michigan State Attorney General's Office concluded that MSU's investigation of the 2014 Thomashow complaint was faulty because it did not consult with experts who were not tied to Defendant Nassar and that if it had, the "result of the 2014 investigation would have been different."[20] The Investigation concluded that MSU displayed "a lack of institutional control" and violated federal campus safety laws for years by failing to disclose Nassar's sexual abuse. The Report stated:[21]

Plaintiffs have alleged that the MSU Defendants are responsible for allowing, condoning, fostering an environment in which Nassar was able to sexually assault and molest the Plaintiffs and other young women for decades. Plaintiffs have asserted several claims under state and federal law, which Defendants seek to dismiss here[22], rather than allow these survivors to have their day in court.

---

[18] Id at p.2.
[19] Id at p. 52.
[20] Michigan Attorney General's Report at p.14.
[21] Id. at p. 35 (emphasis added).
[22] After Defendants filed their motion to dismiss, Plaintiffs sought to amend their complaints to add allegations and information which came to light after the initial complaints were filed and also to address deficiencies and other issues raised by Defendants in their motion.

## STANDARD OF REVIEW

The MSU Defendants have filed a motion to dismiss. Defendants first seek dismissal pursuant to Fed R Civ Pro12(b)(1), alleging that Plaintiffs' claims are barred by immunity. In response, plaintiffs must show that the complaints "alleges a claim under federal law, and that the claim is 'substantial.'" *Musson Theatrical, Inc. v. Fed Exp.,* 89 F.3d 1244, 1248 (6th Cir. 1996). The plaintiffs will survive the motion by showing "any arguable basis in law" for the claims in the complaint. *Michigan S. R.R. Co. v. Branch & St. Joseph Ctys. Rail Users Ass'n., Inc.,* 287 F.3d 568, 573 (6th Cir. 2002) In reviewing a Rule 12(b)(1) motion, the court must accept all material allegations as true and construe them in a light most favorable to the non-moving party. *Lipiec v. United States*, 2015 WL 4886585, at *2 (E.D. Mich. Aug. 17, 2015).

Defendants also seek dismissal under Fed R Civ Pro 12(b)(6). A Rule 12(b)(6) motion tests the legal sufficiency of the claims.   In evaluating whether a complaint sufficiently states a claim, a court must construe the allegations in the complaint "in the light most favorable" to plaintiffs and accept all "well- pl[eaded] factual allegations as true." *Terry v. Tyson Farms*, 604 F.3d 272, 274 (6th Cir. 2010). A claim is well-pleaded when "it contains 'either direct or inferential allegations respecting all material elements' necessary for recovery under a viable legal theory." *Phila. Indem. Ins. Co. v. Youth Alive, Inc.*, 732 F.3d 645, 649 (6th Cir. 2013). The complaint, therefore, need only "contain[] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Reilly v. Vadlamudi*, 680 F.3d 617, 622-23 (6th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Plaintiffs' Complaint includes detailed allegations that are more than sufficient to support their claims under Rule 12(b)(6). Moreover, Plaintiffs' claims are neither barred by any immunity. The Court should deny Defendants' motions to dismiss.

## ARGUMENT

I.  **PLAINTIFFS WITHDRAW THOSE CLAIMS SUBJECT TO A 11TH IMMUNITY DEFENSE**

Many Plaintiffs filed timely amended complaints as of right in response the Defendants' motion to dismiss pursuant to Fed R Civ P 15(b).[23] In these amended complaints, Plaintiffs attempted to address those arguments raised by Defendants. The Court has held those amendments in abeyance. One of the issues addressed in the amended complaint was the withdrawal of all claims subject to immunity under the 11th Amendment. *See e.g.* PageID.29393.

Rather than waste judicial resources on claims subject to a virtual jurisdictional bar (i.e. the 11th Amendment),[24] the obvious forum to litigate these claims in the absence of an unequivocal waiver of the 11th Amendment is the Michigan Court of Claims and/or, in the case of the Elliott-Larsen Civil Rights Act, the Ingham County Circuit Court. This is especially so where state statutory issues of first impression are pending in parallel state litigation. *Colo River Water Conservation Dist v. United States*, 424 U.S. 800 (1976).

Plaintiffs have sought withdrawal of any claim subject to MSU's unwaived 11th amendment-based sovereign immunity such as:

- Plaintiffs' Section 1983 claims against MSU and its agents in their official capacity only (except for Defendant Nassar in his official capacity); and
- Plaintiffs' Civil RICO claims against MSU and its agents in their official capacity only (except for Defendant Nassar in his official capacity); and
- Plaintiffs' Elliott-Larsen Civil Rights Act Claims against MSU and its agents.[25]
- Plaintiffs' common law state claims

---

[23] Other Plaintiffs sought leave to file an amended complaint.

[24] MSU's suggestion that it is not asserting the 11th Amendment while relying on 11th Amendment case law appears to reflect an attempt by MSU to reserve its 11th Amendment immunity to "raise" for the first time on appeal. *See e.g. Kovacevich v. Kent State Univ*, 224 F3d 806, 816 (CA 6, 2000) ("[U]nlike other affirmative defenses, 'the Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar' that it may be raised at any point of the proceedings,' including on appeal.")

[25] Plaintiffs do not seek to withdraw the Title IX and ACA claims as Congress abrogated the state's 11th Amendment immunity from these suits. *Franks v. Kentucky School for the Deaf,* 142 F3d 360, 363 (6th Cir 1998).

II.    **THIS COURT SHOULD ABSTAIN FROM DECIDING THE IMPORTANT STATE LAW ISSUES PRESENTED AND STAY THE PRESENT ACTION UNTIL THOSE ISSUES ARE DECIDED IN THE PARALLEL STATE-COURT LITIGATION**

As this Court is aware, there is parallel litigation pending in the Michigan Court of Claims.[26]

In situations involving parallel litigation, the time-honored doctrine of federal-state comity should be

carefully considered.

> Comity reflects a concern that state courts be permitted to try state cases without judicial interference. See *Younger v. Harris*, 401 U.S. 37, 43-44 (1971). It applies where the federal court is faced with litigation which involves the same parties and the same issues as litigation pending or soon to be pending in the state court. See *Trainor v. Hernandez*, 431 U.S. 434, 440 (1977).

*Newsom v. Vanderbilt Univ*, 653 F.2d. 1100, 1107 (6th Cir. 1981).

As explained in *Levin v. Commerce Energy, Inc*., 560 U.S. 413, 421 (2010), comity "counsels lower

federal courts to resist engagement in certain cases otherwise falling within their jurisdiction." It

reflects

> a proper respect for state functions, a recognition of the fact that the entire country is made up of a union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in separate ways. Fair Assessment [in Real *Estate Ass'n v McNary*], 454 U.S. [100,] 112, 102 S. Ct. 177, 70 L. Ed. 2d 271 [(1981)]; (quoting *Younger v. Harris*, 401 U.S. 37, 44, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971))).

In furtherance of federal-state comity, the Supreme Court has enshrined a number of federal-

state abstention doctrines in decisions such as *Railroad Comm'n of Tex. v. Pullman Co*., 312 U.S. 496

(1941); *Burford v. Sun Oil Co.,* 319 U.S. 315 (1943); *Louisiana Power & Light Co. v. City of

Thibodaux*, 360 U.S. 25 (1959); and *Colorado River Water Conservation Dist., supra.* A common

theme among the abstention cases is a respect for state sovereignty and a recognition that that "Federal

---

[26] Consolidated in the matter of *Kristin Nagle v. Michigan State University*, Michigan Court of Claims Case Number 18-000156-MZ.

courts generally avoid interpreting unsettled state law because state 'courts are in the better position to apply and interpret' their own jurisdiction's law." *Travelers Indem. Co. v. Bowling Green Prof'l Assocs., PLC*, 495 F.3d 266, 272 (6th Cir. 2007).

The most recent articulation of the doctrine is *Colorado River*, which provides for federal abstention where there are parallel state and federal proceedings. *Colorado River* was the subject of discussion by the Sixth Circuit in *Romine v. Compuserve Corp*, 160 F.3d. 337, 339 (6th Cir. 1998):

> In Colorado River, the Supreme Court noted that, despite the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them," 424 U.S. at 817, 96 S.Ct. 1236, considerations of judicial economy and federal-state comity may justify abstention in situations involving the contemporaneous exercise of jurisdiction by state and federal courts. As the Court explained, the principles underlying this doctrine "rest on considerations of '[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" *Colorado River*, 424 U.S. at 817, 96 S.Ct. 1236 (quoting *Kerotest [Mfg. Co. v. C-O-Two Fire Equipment Co.]*, 342 U.S. [180,] 183, 72 S.Ct. 219 [(1952)]). Before the Colorado River doctrine can be applied, the district court must first determine that the "concurrent" state and federal actions are actually parallel. See *Crawley v. Hamilton County Comm'rs*, 744 F.2d. 28 (6th Cir. 1984).

While concurrent state and federal actions must be parallel, "[e]xact parallelism is not required; [i]t is enough if the two proceedings are substantially similar." *Id*. at 340 (internal citations and quotations omitted). Here, there is little room for dispute regarding the parallel nature and substantial similarities between the present action and the state-court proceedings.

Once it is established that there are sufficiently parallel proceedings to give rise to potential comity concerns, the Supreme Court identified four factors for consideration in *Colorado River*, and subsequent decisions have added another four factors. *PaineWebber, Inc. v. Cohen*, 276 F3d 197, 206-07 (6th Cir. 2001). These factors are:

> (1) whether the state court has assumed jurisdiction over any res or property; (2) whether the federal forum is less convenient to the parties; (3) avoidance of piecemeal litigation;... (4) the order in which jurisdiction was obtained[;] ... (5) whether the source of governing law is state or federal; (6) the adequacy of the state court action to protect

12

the federal plaintiff's rights; (7) the relative progress of the state and federal proceedings; and (8) the presence or absence of concurrent jurisdiction.
*Id.*

Here, factors 5, 7, and 8 strongly weigh in favor of abstention, while the other factors either do not apply here or may apply differently to different cases before this Court. With regard to the first factor, neither the state action nor the federal action involves a property dispute. Under factor two, the convenience of the federal forum may depend on the particular domiciles of individual plaintiffs. Unfortunately, the avoidance of "piecemeal" litigation contemplated by factor 3 is made difficult by the various causes of action to which the misconduct of Defendants has given rise. Because there are federal and state claims at issue aspects of this case will likely need to be resolved through proceedings in separate courts. Factor four also varies between plaintiffs as some filed suit first in federal court whereas others (such as Nagle) filed first in the Michigan Court of Claims.

Although the present action involves both state and federal issues, factor five weighs in favor of abstention by this Court. This is largely because Defendants have placed the question of interpretation of MCL 600.5805(6) and MCL 600.5851b at issue in its motion to dismiss.[27] Defendants are advancing a statute of limitations defense against most, if not all, state and federal claims. Thus, for this Court to resolve Plaintiff's claims, this Court will need to interpret a state law that all parties agree was passed in response to the Nassar scandal.

These cases and issues are obviously of great importance to the Michigan Legislature and the State of Michigan's management of its public fisc. Thus, the potentially dispositive first-impression issues of state law should be decided in state court. Comity and the abstention cases weigh in favor of abstention or a stay relative to a resolution of the state law issues in state court. See e.g. *Fowler v. Benson*, 924 F3d 247, 255 (6th Cir. 2019), ("Pullman abstention instructs courts to avoid exercising

---

[27] Defendants' Brief at pp. 2, 66-69.

jurisdiction in cases involving an ambiguous state statute that may be interpreted by state courts so as to eliminate, or at least alter materially, the constitutional question raised in federal court.").

Factor six is largely inapplicable because the Court of Claims actions do not involve issues of federal law. Factor seven weighs in favor of abstention. Although the lead case in this federal consolidated action was filed in 2017 and the first Michigan Court of Claims case was filed in 2018, Defendants have not even filed answers or affirmative defenses and discovery has been stayed. In contrast, discovery in the Court of Claims actions began months ago, is ongoing, and is producing evidence directly related to the defenses in Defendants' motion to dismiss.

Lastly, factor eight weighs in favor of abstention. Although there is concurrent jurisdiction over some of the Plaintiffs' claims, others are within the exclusive jurisdiction of the Court of Claims by virtue of MSU's refusal to waive immunity to suit in federal court.

## III.   NO NOTICE REQUIREMENT EXISTS WHICH BARS CLAIMS AGAINST DEFENDANTS

Defendants contend that there exists a notice requirement which applies to claims in this Court. Defendants attempt to impose a notice requirement that exists for claims filed against the State in the Michigan in the Court of Claims. But, Defendants mischaracterize the precedent and rely on a single unpublished case from the Court of Appeals, while ignoring the cases rejecting this argument.[28] Defendants' argument has been soundly rejected by both federal and state courts.

In *Steckloff v. Wayne State University,* 2019 WL 2929185 (ED Mich 2019) the defendant raised the argument that Defendants make here. Defendant argued that the plaintiff's failure to comply

---

[28] While the Michigan Supreme Court did find the notice requirement mandatory for cases filed in the Court of Claims and further held that substantial compliance and a lack of prejudice to the defendant was not sufficient to satisfy the requirement for court of claims jurisdiction in *McGahan v. Brennan,* 822 NW2d 747 (2012), that holding has no application to claims properly brought in federal court and over which the federal courts have exercised jurisdiction. Likewise, *Hawthorne-Burdine v. Oakland University,* 2018 WL 1832336 (Mich Ct App April 17, 2018) dealt with the notice requirement in an appeal from the decision of the Court of Claims.

with notice requirements contained in the Court of Claims Act was fatal to state law claims brought in federal court. As the Court found in *Steckloff*: "defendant's position overlooks the critical fact that *Hawthorne-Burdine* was litigated in the Court of Claims, where the Court of Claims Act and §600.6431(1) therein are applicable. This case, on the other hand, which was originally filed in the Wayne County Circuit Court, does not involve the Court of Claims." Thus, the *Steckloff* court held that the Court of Claims notice requirement did not apply to cases litigated outside of the Court of Claims.

> Defendant improperly construes § 600.6431(1) in a vacuum. Section 600.6431 is a specific provision within the Court of Claims Act set forth in Chapter 64 of the Revised Judicature Act of 1961. The Court need only its common sense to deduce that the *Court of Claims Act* sets forth the applicable procedures for cases litigated in the *Court of Claims*, not in every other court across the state of Michigan.
> * * *
> Plaintiff's failure to comply with § 600.6431(1) of the Michigan Court of Claims Act does not prohibit her from filing suit against an arm of the State in this Court.

*Steckloff, supra* at *3. Similarly, this case does not involve the Court of Claims and the notice requirement has no applicability.

The Michigan Court of Appeals also issued a published opinion rejecting a similar argument. In *Doe v. Department of Transportation*, 324 Mich. App. 226 (2018) the plaintiff filed a complaint in Ingham County Circuit Court alleging a violation of ELCRA. The Defendant transferred the case to the Court of Claims and filed a motion to dismiss because the plaintiff did not comply with the Court of Claims requirements. Plaintiff filed a motion to transfer the case back to circuit court, arguing that the jury trial exception in MCL 600.6421 (1) applies. The Court of Claims transferred the case back to the circuit court. Defendant appealed, arguing that the Court of Claims had exclusive jurisdiction. The Court of Appeals ruled that the Court of Claims did not err by transferring the case back to the circuit court. The Court stated "[b]ecause the Court of Claims properly transferred the case back to the circuit court, defendant's argument that plaintiff did not follow the procedures necessary to

15

proceed in the Court of Claims is moot and this Court need not address it." *Doe* at 239. The Michigan Supreme Court denied leave to appeal. *Doe v. Department of Transportation*, 503 Mich 876 (October 2, 2018). While the procedural posture of the case was different, clearly if a plaintiff was truly required to file a notice with the Court of Claims to pursue a discrimination claim in circuit court the Court of Appeals would have ruled differently or the Michigan Supreme Court would have granted leave.

In February 2019, the Michigan Court of Appeals addressed the same issue in *Carter v. Michigan State Police*, 2019 WL 846106 (2019). The Court found that the Court of Claims notice provision did not apply once the case was back in circuit court. "Indeed, defendants fail to provide any legal analysis or reasoning with respect to the question of MCL 600.6431(1)'s continuing relevance or application in light of the procedural posture of the case." *Id* at *3. Simply put, the *Court of Claims Act*, including the notice requirement, applies only to cases in the *Court of Claims* and has no bearing on this case.

**IV.   IMMUNITY DOES NOT INSULATE THE INDIVIDUAL MSU DEFENDANTS FROM LIABILITY FOR THEIR TORTIOUS CONDUCT AND VIOLATIONS OF THE CHILD PROTECTION LAW**

Plaintiffs have articulated actionable state law claims against the MSU Defendants and properly pled in avoidance of the immunities afforded by the Governmental Tort Liability Act (GTLA), MCL 691.1407. While some may not have used specific phrases that mirrored the GTLA, the complaints when read as a whole address the requirements of the act and have been clarified by the amended complaints. In their initial pleadings and subsequently offered amendments, Plaintiffs pled how the MSU employees were acting in the course and scope of their employment when they committed acts that were exempted from immunity either because their actions constituted gross negligence, were in the provision of medical care and treatment, or were exempted by other statutorily recognized exceptions. For purpose of Rule 12(b)(6), Plaintiffs have stated a claim. Whether the

intricacies of each exception can be established following the completion of discovery is a separate task for a separate day.

Governmental employees acting within the scope of their authority are generally immune from tort liability except in cases in which their actions constitute gross negligence. *Maiden v. Rozwood,* 461 Mich. 109, 121-122, 597 N.W.2d 817 (1999) This immunity is codified in MCL 691.1407.

In determining whether a governmental employee's conduct is protected by the GTLA, it is important to consider both the actor and the claims alleged. *Odom v. Wayne Co.,* 482 Mich. 459, 479-480 (2008). With regard to lower-ranking governmental employees, it must be determined whether the plaintiffs' complaints assert claims of negligence or intentional tort. *Odom,* at 684. For claims of negligence, it must be determined whether the employee was acting in the course and scope of their employment at the time that the injury occurred and whether the employee was exercising or discharging a governmental function. *Id.* If those preconditions are met, the employee's conduct is immune unless the plaintiff can establish "gross negligence that was the proximate cause of the injury or damage." The party seeking to impose liability on a governmental agency/employee has the burden of pleading in avoidance of immunity. *Mack v. City of Detroit,* 467 Mich. 189, 198, 649 N.W.2d 47 (2002)[29]

Gross negligence is an exception to the GTLA. It is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(8)(a). This is not an insurmountable standard. Gross negligence has been generally characterized as a willful disregard of safety measures and a singular disregard for substantial risks. *Tarlea,* 263 Mich. App. at 90. "[A] plaintiff must adduce proof of conduct 'so reckless as to demonstrate a substantial lack of concern for whether an injury results.'" *Id.* at 123. As explained in *Tarlea,* "[i]t is as though, if an

---

[29] For the intentional torts asserted, Defendants are not entitled to immunity unless they can establish the *Ross* test which examine whether the Defendants' acts were undertaken in good faith or without malice. See *Odom, supra* at 480.

objective observer watched the actor, he could conclude, reasonably, that the actor simply did not care about the safety or welfare of those in his charge." *Id*. If reasonable jurors could honestly reach different conclusions regarding whether conduct constitutes gross negligence, the issue is a factual question for the trier of fact. *Jackson v. Saginaw Co,* 458 Mich. 141, 146-147 (1998).

Plaintiffs pled both grossly negligent conduct and how the conduct was "the" proximate cause of Plaintiffs being sexually assaulted. The most recent cases from the Michigan Courts discussing "the proximate cause" are *Ray v. Swager,* 501Mich. 52 (2017) and *Ray v. Swager, on remand,* 321 Mich. App. 755 (2017). In those decisions, the defined what constitutes "the proximate cause":

> Provided that a defendant's gross negligence was a factual cause, the court must then consider whether the defendant was a proximate—i.e., legal—cause by addressing foreseeability and whether the defendant may be held legally responsible for his or her conduct. *Id.* at 65, 74, 903 N.W.2d 366.
>
> Once the various proximate causes have been determined, the question then becomes whether, taking all possible proximate causes into account, the government actor's gross negligence was the proximate cause of injury. *Id.* at 83, 903 N.W.2d 366. This requires "considering defendant's actions alongside any other potential proximate causes to determine whether defendant's actions were, or could have been, 'the one most immediate, efficient, and direct cause' of the injuries." *Id.* at 76, 903 N.W.2d 366. The relevant inquiry is not whether the defendant's conduct was the immediate factual cause of injury, but whether, weighing the legal responsibilities of the actors involved, the government actor could be considered "the proximate cause." *Id.* at 71–72, 903 N.W.2d 366.

*Ray,* 321 Mich. App. 759-760.

Reviewing Plaintiffs' Complaints as a whole and taking all well-pleaded factual allegations as true, Plaintiffs have asserted actionable claims of grossly negligent conduct against the individual defendants that was the proximate cause of Plaintiffs' damages. *Gunesekera v. Irwin,* 551 F.3d 461, 466 (6th Cir. 2009). Plaintiffs' Complaints contain factual allegations that MSU knew about, and disregarded, Nassar's sexually inappropriate activities in an effort to protect him and the MSU brand instead of considering that conduct alongside other potential proximate causes, Defendants' actions

were, or could have been, "the one most immediate, efficient, and direct cause" of the injuries alleged. Plaintiff has sufficiently pled in avoidance of governmental immunity.

Some plaintiffs have asserted other statutory exceptions that are applicable and, at this pleading stage, sufficient to avoid the GTLA and state claim upon which relief can be granted. Here, Defendants are individuals who are physicians or otherwise capable of providing healthcare. MCL 691.1407(4) provides that immunity is not afforded to situations when the governmental actor is providing medical care and treatment to a patient. *Briggs v. Oakland Cnty.* 276 Mich. App. 369 (2007). Defendants' contention that this exception cannot be used by Plaintiffs who did not file a notice of intent pursuant to MCL 600.2912b is incorrect. A notice of intent need only be filed in medical malpractice cases *Bryant v. Oakpointe Villa Nursing Cntr.,* 471 Mich. 411 (2004). As noted in *Bryant,* however, factual development is necessary for the Court to complete the two-step analysis adopted by the Court, rendering dismissal inappropriate.

Similarly, factual development is required before the Court can address the merits of the proprietary business exception to GTLA. MCL 691.1413. See *Hyde v. Univ. of Michigan Bd. of Regents,* 426 Mich. 223, 393 N.W.2d 847 (1986). For this exception a plaintiff must show that the activity is conducted for the primary purpose of producing pecuniary profit and the activity cannot normally be supported by taxes or fees. As alleged in Plaintiffs' Complaints, Nassar was a physician at Michigan State University who was contractually required to perform community outreach services, including acting as a USAG's team physician. Discovery needs to be conducted to further explore MSU's agreements, whether MSU profited from those agreements, and whether the proprietary business function applies. At this stage, dismissal is not proper.

In their complaints, Plaintiffs also allege that Defendants failed to report child abuse in violation of the Child Protection Law, (CPL) MCL § 722.621 et seq.  This act imposes a duty on individuals to report suspected abuse and further provides that a person who is required to report and

19

fails to do so is civilly liable for the damages proximately caused by the failure. MCL § 72.633 (1). By specifically including government employees as mandatory reporters, the legislature intended that the reporting requirements and civil liability provisions apply to government employees and officers.

Defendants contend that Plaintiffs' CPL claims are barred by the immunity provisions of the GTLA, per *Jones v. Bitner*, 300 Mich App 65 (2013)[30], which ruled that the GTLA abrogates its prior ruling in *Williams v. Coleman*, 194 Mich App 606 (1992) (governmental immunity not available for claims under CPL as legislation intended to abrogate common law immunity). However, *Jones* ignored clear precedent from the Michigan Supreme Court which holds that governmental immunity is expressly waived when a statute names the employees of the state and its political sub-divisions

In *Anzaldua v. Band,* 457 Mich 530, 551- 2 (1998) the Supreme Court found that the state had waived immunity from suit under the Whistleblowers Protection Act, MCL 15.361, by including the state and its political subdivisions in the definition of "employer."[31] *Id* at 551-552. The Court of Appeals applied this rationale to a claim for retaliatory discharge under the workers compensation disability act. Because the legislature identified the state as an employer subject to the act, the defendant was not entitled to governmental immunity. *Lucero v. Dept of Corrections,* 2015 Mich App LEXIS 500 (2015).  Similarly, the legislature included employees of the state and other government agencies as mandatory reporters with potential civil liability for violation of that duty. This claim, therefore, is not barred by governmental immunity.

If the GTLA applies to the Plaintiffs' CPL claim, Defendants are still not entitled to relief, as Plaintiffs' allegations against Defendants constitute an intentional tort for which governmental

---

[30] Likewise, the court in *Campbell v. Dundee Cmty Sch* 2015 US Dist LEXIS 85462 (ED Mich 2015), the unpublished case on which Defendants relied, cited only to *Jones, supra* with no discussion of the waiver issue. Although the case was affirmed on appeal, the CPL claim was not addressed as the plaintiff abandoned that claim.
[31] The same analysis has been applied to ELCRA claims against the state *Mack v. Detroit,* 467, 186, 195 (2002).

immunity does not apply.  MCL § 691.1407(3).  The test enunciated in *Ross v. Consumers Powers*,

420 Mich 567(1984), applies to intentional torts. *Odom, supra* at 472-3. To be entitled to immunity,

Defendants must demonstrate that:

1)     The acts were undertaken during the course of their employment and the employee was acting or reasonably believed that he was acting within the scope of his authority;
2)     the acts were undertaken in good faith or were not undertaken with malice; and
3)     the acts were discretionary, as opposed to ministerial.
    *Odom, supra* at 480.

Defendants cannot satisfy this test and certainly cannot support dismissal where Plaintiffs

have alleged that the acts of Defendants were willful and taken with knowledge that Plaintiffs and

other children were being abused by Nassar and Defendants refused to take steps to report the abuse.

Plaintiffs' allegations are that Defendants' failure to report abuse and neglect was intentional and not

an isolated failure.  Defendants ignored and concealed complaints about Nassar and misled Plaintiffs,

and lied to investigators.  These actions were intentional, not mere negligence.

The Defendants could not have believed that they were acting reasonably in taking these

actions to conceal the long and extensive record of complaints against Nassar.  In addition, Defendants

must demonstrate that they were acting in good faith or without malice.  A defendant whose behavior

demonstrates "such indifference to whether harm will result" is deemed to have acted with malice.

*Odom, supra* at 475.  The actions of these Defendants were not taken in good faith or in an effort to

protect Plaintiffs from abuse. By going to such lengths to protect the abuser, Defendants demonstrated

clear indifference to whether harm would result from Nassar's continued abuse.  Plaintiffs have

asserted actionable state-law claims in avoidance of governmental immunity.

## V.     PLAINTIFFS HAVE SUFFICIENTLY PLED TITLE IX LIABILITY

Defendants argue that Plaintiffs did not plead a viable Title IX claim. Plaintiffs' complaints,

however, set forth plausible claims of Title IX liability against MSU, because they demonstrate that

they had standing under the statute, that MSU had actual notice and responded with deliberate indifference. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)

**A.    Plaintiffs Have Sufficiently Plead Title IX Standing**

MSU's argument, that non-MSU students standing under Title IX, is not accurate. Courts have held that non-students may bring claims in particular circumstances, especially where it can be shown that the institution exercises "control" over the harasser.

The statute does not restrict its ambit to "students," stating in relevant part: "No **person** in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance …" Title IX of the Education Act of 1972, 20 U.S.C. §1681 (a).

The federal regulations accompanying the statute offer additional support. The focus of the legislation, as stated in its "Purpose" is to "eliminate … discrimination on the basis of sex in any education program or activity receiving Federal financial assistance." 34 CFR 106.1 Depending on the context, the potential target of discrimination may be a "person," and sometimes a "student." For example, the word "person" is often used throughout the regulations when describing Title IX's prohibitions against discrimination, such as in admission – which, by necessity, would be against a non-student applicant. See, e.g., 106.21 ("No person shall, on the basis of sex, be denied admission, or be subject to discrimination in admission, by any recipient …). Similarly, mirroring the language of the Title IX statute, 34 CFR 106.31 states that "… no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other educational program or activity operated by a recipient …".

In contrast, the regulations use the term "student" when it is apparent from the context that it cannot be applied to a non-student, such as in student housing, [34 CFR 106.31 (b) (5); 34 CFR

106.32] access to classes, [34 CFR 106.34] counseling, [34 CFR 106.36] or financial aid. [34 CFR 106.37]. In short, the regulations contemplate that there are situations where discrimination may only apply to students, and others – like here – where they apply to a broader class of "persons."

**B.      Courts Recognize that Non-Students Have Standing to Bring Title IX Claims**

Courts recognize that non-students may bring Title IX claims where they can show they were "subjected to discrimination under [the offending institution's] education program or activity." *Doe v. Brown Univ.*, 896 F.3d 127, 133 (1st Cir. 2018). Non-students' claims may succeed if they show such a nexus, in what is sometimes termed the "control" test. This properly puts the focus on the actions of the institution, rather than on the technical status of the victim.

In conformity with this test, the Supreme Court has held that "The statute's plain language confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs." *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 644 (1999)[32] The First Circuit followed this guidance in *Doe v. Brown,* when it reasoned that "a potential Title IX plaintiff seeking relief for being 'subjected to discrimination under' an education program must be a participant, or at least have the intention to participate, in the defendant's educational program or activity seems logical since the 'discrimination' that Title IX prohibits is not the acts of sexual assault or sexual harassment in and of

---

[32] Because *Davis* stated that an institution "may not be liable for damages unless its deliberate indifference "subject[s]" its students *(sic)* to harassment," at least one other court has seized on that language to require a Title IX plaintiff to be a student at the offending institution. In *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1056 (8th Cir. 2017), the Appeals Court noted that the district court had done exactly that. However, the 8th Circuit did not analyze that issue, instead affirming the district court on different grounds.

*Davis* involved peer on peer student harassment and there was no dispute about the plaintiff's student status. From the context, the *Davis* court did not hold that Title IX's coverage was restricted to students, but only referenced in shorthand the status of the parties. Indeed, as noted above, the Court's actual holding was that liability focused on the degree of control of the institution over the program or activity, not the status of the victim as a student or not.

themselves, but rather the differential treatment by a funding recipient of persons of a particular sex who are taking part or trying to take part in its educational program or activity but are suffering acts of sexual harassment or assault that undermine their educational experience." *Id*. at 131-132.

This test, focusing on the actions of the institution, was also the basis of this Court's decision in *Loewen v. Grand Rapids Med. Educ. Partners*, 2012 WL 1190145, at *12 (W.D. Mich. Apr. 9. 2012) (Quist, J.). MSU misrepresented this case as holding that there was "no Title IX liability where plaintiff 'offer[ed] no evidence to show that she was an MSU student'" [Brief at 27, RE 1194, PageID 27211] More accurately, this Court analyzed the claim under two alternate tests – one, whether the plaintiff was an MSU student, or two, whether MSU exercised control over the program or activity in which Loewen participated. *Id*. at *34 In *Loewen,* a medical resident sued both the hospital's residency program and MSU for employment discrimination. Judge Quist reasoned that they were not joint employers because the hospital controlled all aspects of the residency, and there was no allegation that individuals connected with MSU were involved in the discriminatory acts. This court therefore concluded that the plaintiff had no standing to bring her Title IX claim.

In contrast, here, the non-student Plaintiffs have adequately pled that MSU controlled and/or operated the programs under which Larry Nassar victimized the Plaintiffs. One complaint, for example, states, in relevant part:

> 73.   Plaintiffs were "persons" as defined by Title IX …

> 74.   Nassar's services to the Plaintiffs, at all times under the aegis of MSU, constituted educational programs or activities receiving Federal financial assistance.

> 75.   Plaintiffs suffered sexual assault because of their gender, female, that was so severe, pervasive, and objectively offensive that it could be said to deprive them of access to the educational programs or activities provided by MSU.

As to certain non-MSU students who are plaintiffs in this action, MSU exercised considerable control over the particular programs and activities in which Nassar assaulted them. Plaintiff Jane JJF Doe was assaulted at an MSU Health System facility. [Complaint, ECF 1, PageID 13] For those (such as Plaintiff LAM) who were assaulted at Holt High School, it was alleged:

> 39.    Commencing September 29, 1998, LAM saw Nassar about twice a week for six months, at a small out-building at the fringes of the Holt High School sports complex, which did not strike LAM as a regular patient facility, but was (on information and belief) an MSU satellite facility. [Id., PageID 10, emphasis added]

In contrast to the plaintiff in *Loewen,* Plaintiffs here have sufficiently alleged that MSU operated the program or activity in which the non-student plaintiffs were assaulted, and, importantly, that the discrimination operated to exclude, deny, and deprive the plaintiffs of the educational opportunities or benefits provided by MSU in those programs or activities.

The First Circuit recognized this path for non-student plaintiffs in *Doe v. Brown,* 896 F.3d at 133. Though they found against the plaintiff there (a student at a different university alleging a peer-on-peer assault), the court explicitly held open the possibility that a non-student could maintain a Title IX claim if she sufficiently pled that she suffered discrimination at the hands of the offending program's "education program or activity."

> Doe's complaint alleged that she suffered "substantial interference with her access to educational opportunities or benefits" as a direct result of Brown's alleged deliberate indifference. But her complaint did not allege that she participated or even would have participated in any of Brown's educational programs or activities. Even accepting all of Doe's well-pleaded facts as true, her complaint contains no factual allegation as to how Brown's deliberate indifference "deprive[d] [Doe] of access to the educational opportunities or benefits provided by [Brown]." *Davis*, 526 U.S. at 650. Therefore, Doe's complaint, on its face, fails to establish that she has been "subjected to discrimination under [Brown's] education program or activity." 20 U.S.C. § 1681(a). Finding no plausible claim under Title IX in Doe's complaint, we must affirm the district court's grant of Brown University's motion for judgment on the pleadings. [*Id.*, emphasis added]

Because *Doe* did not make the requisite allegations, her claim failed. In contrast, Plaintiffs have sufficiently pled that they were "persons" under Title IX who suffered discrimination at programs controlled and operated by MSU, and were excluded from and denied the benefits of the programs or activities MSU offered. Accordingly, they have plausibly alleged standing as non-students.[33]

Finally, in considering the question of "standing," it should be noted that both *Doe v. Brown* and *K.T. v. Culver-Stockton College* involved student on non-student assault, which is arguably less persuasive in terms of culpability, compared to an assault by a university's physician. In a recent law review article. The author argues that it is consistent with the spirit of Title IX to affirm its reach non-students where the conduct occurred on campus through a university "program," and deprived them the benefits of that program. [Hannah Brenner, *A Title IX Conundrum: Are Campus Visitors Protected] from Sexual Assault?*, 104 Iowa L. Rev. 93 (2018)] As shown above, the 1st and 8th Circuit, along with Judge Quist in *Louwen*, have already recognized this path to standing. These cases therefore be affirmed under the same reasoning.

### C.     Plaintiffs Plausibly Pled They Reported to Appropriate Persons

Defendants' argument that MSU employees – including the then-head coach of the women's gymnastics team, athletic trainers and coaches, and a psychology professor – are not "appropriate

---

[33] MSU's brief additionally cites *Yan v. Pa. State Univ.*, 2015 WL 3953205, at *13 (M.D. Pa. June 29, 2015) aff'd, 623 F. App'x 581 (3d Cir. 2015), an order in a *pro se* case which affirmed a magistrate's report and recommendation without further discussion. The magistrate in *Yan* relied on *Romeo Community Schools v. United States Department of Health, Education, and Welfare*, 438 F.Supp. 1021 (E.D. MI. 1977), judgment affirmed, 600 F.2d 581 (6th Cir.), cert. denied, 444 U.S. 972 (1979). But *Romeo's* 42 year old holding was so narrow that it even concluded that non-student employees did not have a claim under Title IX, an interpretation that even MSU concedes is now incorrect in light of the later Supreme Court decision in *N. Haven Board of Education v. Bell*, 456 U.S. 512 (1982) (MSU brief at 27, fn. 21, RE 1194, PageID 27211). In short, because *Yan* is a magistrate's decision in a pro se case that relies on a 42-year-old-holding that the Supreme Court has superseded in material part, it should carry no weight.

persons" for purposes of Title IX liability is misguided.  Defendants' motion to dismiss under Fed.

R. Civ. P. 12(b)(6) is "a test of the plaintiff's cause of action as stated in the complaint, not a challenge

to the plaintiff's factual allegations." *Golden v. City of Columbus,* 404 F.3d 950, 958-9 (6th Cir. 2005).

At this stage, Plaintiffs need only plead factual allegations sufficient to "raise a right to relief above

the speculative level" and allege "enough facts to state a claim to relief that is plausible on its face."

*Twombly*, *supra* at 570 (2007).

Here, Plaintiffs have pled that multiple MSU employees, including Defendant Klages, had

actual knowledge of Nassar's sexual assaults of young girls and women as early as 1997. Plaintiffs'

factual allegations, for example, include:

- "Defendant Klages is the former women's gymnastics coach at MSU, who (as described below) had actual knowledge of Nassar's sexual assaults of minor female gymnasts in 1997."
- "Sixteen-year-old high school gymnast Larissa Boyce, who was participating in an MSU summer gymnastics program, reported in 1997 to MSU gymnastics coach, Kathie Klages, that Nassar was touching her intravaginally during medical appointments."
- "Klages interrogated Boyce and the other gymnast and dissuaded them from advancing their complaints."
- "[Christie] Achenbach told her coach, Kelli Bert, what Nassar had done. Bert replied, "He's an Olympic doctor and he should know what he is doing.""
- "Tiffany Thomas Lopez, an MSU softball player, was referred to Nassar for low back pain. During her visits with him, he inserted his thumb and later his fingers into her vagina, sometimes for 15 minutes, she said. She discussed this with a trainer, Lianna Hadden, who told her she needed to tell Destiny Teachnor-Hauk, an athletic trainer at MSU. But Teachnor-Hauk assured Thomas this was "actual medical treatment." Teachnor-Hauk told Thomas that if she were to pursue this, it would burden her family, cause heartache and trauma, and asked "why would [you] drag him through this?""
- "MSU volleyball athlete Jennifer Rood Bedford stated that "before 2002" she reported to Hadden that Nassar had made her uncomfortable with his examination techniques. Hadden dissuaded her from making a statement."
- "In 2004, Kyle Stephens, then 12, reported to her MSU psychologist Gary Stollak that Nassar (a family "friend") had been regularly molesting her since she was six years old (1998), including exposing himself, masturbating in her presence, and penetrating her with his fingers." [Complaint, 1:18-cv-00829, ECF 1, pp. 3-7]

These allegations set forth a plausible claim that "appropriate persons" had actual knowledge

of Nassar's sexual abuse for purposes of Title IX liability against MSU. "Actual knowledge requires

only that a single school administrator with authority to take corrective action had actual knowledge of the sexual harassment." *Stiles ex rel. D.S. v. Grainger Cty,* 819 F.3d 834, 848 (6th Cir. 2016). Defendants argue that the MSU employees who received reports prior to 2014 did not have the authority to terminate or suspend Nassar's employment and are thus not "appropriate persons" whose knowledge of the abuse can be imputed to MSU. But that is simply not the prevailing standard in this circuit.

The Sixth Circuit has not held that the only permissible "corrective action" is termination or suspension of employment, Defendants have conveniently ignored the cases that have reached the opposite conclusion. For example, in *Doe v. Farmer,* 2009 WL 3768906 (M.D. Tenn. November 9, 2009), the court found that even where a school principal did not retain the ultimate ability to fire or suspend teachers, he was an "appropriate person" because he could "confront a teacher and, as the teacher's supervisor, order a stop to any inappropriate behavior" and it was his responsibility to receive allegations of sexual abuse pursuant to the school's policy. *Farmer* at *8. The *Farmer* opinion held: "As long as the official possesses the ability and duty to take meaningful steps towards stopping the abuse, the official's deliberate indifference should translate into school board liability under Title IX." *Farmer* at *8).

Even the cases cited by Defendants do not support a conclusion that only supervisors with authority to terminate or suspend employment are "appropriate persons." *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648 (5th Cir. 1997), was heavily relied on by Defendants but does not hold that termination or suspension is a necessary power for an "appropriate person." Rather, the court noted that "what is appropriate remedial action will necessarily depend on the particular facts of the case," and that while "prompt termination or suspension of the individual would ordinarily be sufficient," other less severe actions may also be appropriate – thus, "in order to qualify as a supervisory employee whose knowledge of abusive conduct counts as the district's knowledge, a

28

school official must at least serve in a position with the authority to repudiate that conduct and eliminate the hostile environment on behalf of the school district." *Rosa H*. at 660. In *Plamp v. Mitchell Sch. Dist.*, 565 F3d 450 (8th Cir. 2009), the court noted remedial actions besides suspension that would have made a guidance counselor an "appropriate person" including curtailing his teaching or other school-related privileges, requiring him to attend sessions or meetings about his behavior, or ensuring that he was under greater supervision. *Plamp* at 458.

Here, Plaintiffs have alleged that one of the earliest reports of Nassar's sexual assault was made to Defendant Klages. It is plausible on its face that Klages head coach of MSU's women's gymnastics team possessed some authority to take remedial action in response to a report of sexual assault by a young athlete under her care and supervision. Further, courts within this judicial circuit have found that an athletic coach is an "appropriate person" for purposes of Title IX liability, particularly where the university has vested that coach with responsibility for the supervision and care of students on a school trip. See *Doe v. Hamilton County Board of Education*, 329 F.Supp.3d 543, 556-7 (E.D. Tenn. 2018). Similarly, it is plausible that MSU vested Klages with such responsibility as a gymnastics coach generally, but particularly during the summer camp at which Larissa Boyce reported Nassar's assaults to Klages. Likewise, Plaintiffs' complaint contains allegations that other coaches and trainers, such as Kelli Bert, Lianna Hadden, and Destiny Teachnor-Hauk, had actual knowledge of Nassar's abuse, and they could plausibly be "appropriate persons" with responsibility for the care and supervision of patient-athletes at MSU. It is also plausible that any of these individuals could have had the ability to take remedial actions such as those noted in *Plamp*, such as ensuring greater supervision of Nassar while he was with patient-athletes.

Further, courts have held that at the motion to dismiss stage, claims such as Plaintiffs' – i.e., allegations that prior reports of harassment by a university employee are sufficient to put a school on actual notice – are sufficient to survive dismissal, even where it has not been definitively established

that an "appropriate person" was on notice. See *Adams v. Ohio State University*, 300 F.Supp.3d 983, 996-7 (S.D. Ohio 2018). In *Adams*, plaintiffs alleged that other students had reported a professor's predilection for sexual misconduct in course evaluations and a campus climate survey. Noting that discovery could reveal that an "appropriate person" at the university had been informed, the Court declined to dismiss plaintiffs' Title IX claims. This Court should reach the same conclusion.

### D.      Plaintiffs Plausibly Pled that MSU Was Deliberately Indifferent to Known Harassment

As the above section demonstrates, Plaintiffs alleged reporting sexual harassment to appropriate persons. MSU ignores these allegations. Their brief is premised on the assumption that MSU did *not* have knowledge of Nassar's sexual assaults until 2014, ignoring the litany of brave young women who did come forward, from Larissa Boyce's 1997 complaint to Kathy Klages through Rachel Denhollander's 2016 criminal complaint, before MSU finally relieved Nassar of his duties. [Complaint, ECF 1, pp. 3-7] As such, MSU had actual knowledge of Nassar's harassment; and because (by their own admission) they did nothing whatsoever to stop his sexual abuse for at least 17 years, and then failed to take any actual steps to supervise him for the next two, then the Plaintiffs have plausibly pled that MSU was deliberately indifferent.

"A failure to take *any* disciplinary action despite reports of repeated sexual harassment rises to the level of deliberate indifference. ... In less obvious cases, the proportionality of the school's response in light of available information lies at the heart of the indifference analysis.") *McCoy v. Bd. of Educ., Columbus City Schs.*, 515 F. App'x 387, 391 (6th Cir. 2013).

MSU was also deliberately indifferent after Amanda Thomashow reported her sexual assault in April, 2014. One Plaintiff's complaint, for example, pled:

> 16.      In April, 2014, recent MSU grad Amanda Thomashow visited Nassar's MSU office for hip pain. "During that appointment, Nassar cupped her buttocks and then, about an hour into the appointment, he sent the only other person present, a female resident, out of the examination room. Then he massaged her breast and vaginal area. She

told him to stop, but he didn't. He only stopped when she physically removed his hands from her." [https://www.lansingstatejournal.com/story/news/ local/2018/01/16/larry-nassar-michigan-state-amanda-thomashow/1034302001] Nassar also became physically aroused during this "treatment." [*Thomashow et al v. MSU et al.*, Case No. 17-00684, Ct Doc 69, Pg ID 4315 *et seq.*]

17.     On April 21, 2014, Thomashow reported this conduct to MSU Dr. Jeffrey R. Kovan, D.O., who in turn reported Nassar's conduct to MSU's Office for Inclusion and Intercultural Affairs (the MSU office in charge of conducting complaints of sex harassment under Title IX). [Id.]

18.     But after three months, relying on the medical opinions of four MSU employees who had close ties to Nassar, the Title IX investigator determined Thomashow received an appropriate medical procedure and likely misinterpreted it as sexual assault because she wasn't familiar with osteopathic medicine and wouldn't know the "nuanced difference."                                    [Id.; https://www.lansingstatejournal.com/story/news/local/2018/01/16/larry-nassar-michigan-state- amanda-thomashow/1034302001]

19.     Although the university formally cleared Nassar, Dr. William Strampel, then-Dean of the College of Osteopathic Medicine, agreed on July 30, 2014 with Nassar for his return to clinical duties, provided he follow new "protocols" including wearing gloves and fully explaining his actions. Strampel and Douglas Dietzel, D.O. were charged with oversight to ensure that Nassar complied.

20.     However, they did nothing to enforce these guidelines, nor inform others that these guidelines were in place. Nassar continued having unfettered access to his young female victims. [E.g., Case No. 17-00684, ECF 69, PgID 4323]

Instead of taking these allegations as true, MSU grossly misrepresents and minimizes Ms. Thomashow's complaint, even omitting it from a timeline they submitted with their motion [MSU Brief, ECF 1194, PageID 27216-7; also see **Exhibit 3**, "Timeline of Key Events," ECF 1194-3] They later allege that "Nassar was cleared of wrongdoing at the time," [Brief, *Id.* at PageID 27244] and argue that they did all they could to report, investigate, and "gave Nassar instructions to follow when providing treatment near sensitive areas." [*Id.*, PageID 27217]

31

When MSU submitted its brief on August 26, 2019, they knew that Michigan's Attorney General had already found that Kristine Moore (who investigated Ms. Thomashow's 2014 complaint) was determined to have "failed to properly investigate 2014 allegations against Nassar." They knew that the Michigan Attorney Grievance Commission had "admonished" Ms. Moore for her "deficient" handling of the investigation. They knew that Moore's failings "were not without consequences because Nassar was permitted to return to work, and it has been reported that approximately 20 more women and girls were sexually assaulted by Nassar after [her] report and until he was finally terminated in September 2016." And MSU knew that William Strampel, the Dean who was supposed to oversee Nassar after the 2014 investigation, was criminally convicted for his willful and abject neglect of duty.

Despite knowing all this, MSU omitted any mention of the widespread official condemnation of its handling of the 2014 investigation – continuing to maintain that it is not even plausible that they were deliberate indifferent, or that they acted "clearly unreasonably in light of the known circumstances." *McCoy,* 515 F. App'x at 391

This case is much like *Patterson v. Hudson Area Sch.,* 551 F.3d 438, 439 (6th Cir. 2009), where the school district took some measures, but it did not stop the harassment (in that case, peer-on-peer). The court held, "Where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances." In summary, because it was plausibly pled that MSU was deliberately indifferent to known harassment over nearly two decades, its motion to dismiss must be denied.

## VI.   PLAINTIFFS STATED VIABLE ACA CLAIMS

Plaintiffs have also asserted claims against Defendants for violation of the Affordable Care Act, 42 USC § 18116, which prohibits discrimination on the basis on sex in the receipt of health care

32

services. As an initial matter, Defendants seek to dismiss claims of those Plaintiffs who allege discrimination prior to the enactment of the ACA on March 23, 2010. Plaintiffs do not dispute that dismissal of those claims is appropriate.

However, the other grounds on which Defendants seek dismissal of this claim do not withstand scrutiny. First, Defendants assert that Plaintiffs lack standing to bring this claim because they were not subjected to discrimination "under health program or activity" that receives federal funding. In taking this position, Defendants provide no analysis of the statutory language or the appropriate regulations, which clearly indicate that MSU is a covered entity providing a "health program or activity" in which Plaintiffs were subjected to sex discrimination.

A covered entity is defined as any entity "that operates a health program or activity, any part of which receives Federal financial assistance." 45 CFR §92.4 Health program or activity is then defined "the provision or administration of health-related services, health-related insurance coverage, or other health-related coverage, and the provision of assistance to individuals in obtaining health-related services or health-related insurance coverage. For an entity principally engaged in providing or administering health services or health insurance coverage or other health coverage, all of its operations are considered part of the health program or activity, except as specifically set forth otherwise in this part. Such entities include a hospital, health clinic, group health plan, health insurance issuer, physician's practice, community health center, nursing facility, residential or community-based treatment facility, or other similar entity." Nowhere in those definitions does it require that the delivery of health services be the primary focus of the covered entity. To the contrary, the regulations recognize that not all covered entities will be principally engaged in health programs

or activities by specifically indicating separate rules for those entities for which health care is their primary focus while not excluding other entities.[34]

Next, Defendants argue that the ACA claims must be dismissed for the same reasons as the Title IX claims, i.e. that they did not report to an appropriate person and that Plaintiffs did not allege that Defendants had actual knowledge of Nassar's sexual misconduct or acted with deliberate indifference. Yet as described above, Plaintiffs have plausibly pled reporting to an appropriate person as well as actual knowledge and deliberate indifference to the sexual harassment and abuse of Plaintiffs and other for more than two decades. See *supra* at pages 21-32. Thus, Plaintiffs have pled a plausible claim under the ACA which should not be dismissed.

## VII.   PLAINTIFFS PLED PLAUSIBLE SECTION 1983 CLAIMS

As set forth above, Plaintiffs have requested to withdraw those claims to which 11th Amendment immunity applies. If, however, the Court considers these claims on the merits, Plaintiffs address the arguments raised by Defendants below.

The Due Process Clause protects individuals from "arbitrary" government actions. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998). (But "only the most egregious official conduct . . . [is] 'arbitrary in the constitutional sense.'" *Id*. at 846). Thus, to plead a substantive due process claim against a government official, a plaintiff must allege that the official (1) engaged in "conscience-shocking" behavior, which (2) invaded a fundamental constitutional right. See *Id*. at 846–47. Conduct "shocks the conscience" when it is so "offensive that it [does] not comport with traditional ideas of fair play and decency." *Rochin v. California*, 342 U.S. 165, 169 (1952).

---

[34] Nor does the one unpublished case cited by Defendants suggest a different result as that court was considering whether a corrections facility in which the pro se plaintiff was incarcerated constituted a covered entity. Although the magistrate considered the question in making its report and recommendation, it reached no conclusion as it dismissed the motion to amend to add the ACA claim because the plaintiff did not seek leave to file the amendment. *Richards v. Minnesota*, 2016 WL 818657, *13 (D Minn 2016).

Here, Plaintiffs have alleged that, contrary to all dictates of conscience, the Defendants knowingly allowed Defendant Nassar to continue to sexually assault Plaintiffs and other young women for decades under the guise of medical treatment by ignoring early reports of abuse, failing to investigate complaints, failure to enforce guidelines, failing to supervise Nassar, and concealing complaints of abuse from patients, parents, the public, investigators and even law enforcement, as well as other actions alleged in the complaints.  That deliberately callous behavior infringed Plaintiffs' constitutional rights.

### A.      The Complaint Sufficiently States a Claim for Government Defendants' Violation of Plaintiffs' Fundamental Constitutional Right to Bodily Integrity

The Supreme Court has long recognized that the Fourteenth Amendment protects individuals' fundamental right to "bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 272 (1994).  Plaintiffs' complaints deal with the scope of the right to bodily integrity, an indispensable right recognized at common law as the "right to be free from ... unjustified intrusions on personal security" and "encompass[ing] freedom from bodily restraint and punishment." *Ingraham*, 430 U.S. at 673–74." The Sixth Circuit recently explained the broad scope of this constitutional right:

> This common law right is first among equals. As the Supreme Court has said: "No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734 (1891); cf. *919 *Schmerber v. California*, 384 U.S. 757, 772, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) ("The integrity of an individual's person is a cherished value of our society."). Absent lawful authority, invasion of one's body "is an indignity, an assault, and a trespass" prohibited at common law. *Union Pac. Ry.*, 141 U.S. at 252, 11 S.Ct. 1000. On this basis, we have concluded "[t]he right to personal security and to bodily integrity bears an impressive constitutional pedigree." *Doe v. Claiborne Cty.*, 103 F.3d 495, 506 (6th Cir. 1996).

*Guertin v. State*, 912 F.3d 907, 918–19 (6th Cir. 2019)

Government officials violate this sacred right when they unjustifiably violate an women's body under the guise of medical treatment or decisions.  See,  e.g., *Washington v. Harper*, 494 U.S.

210, 229 (1990) ("The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty."); *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 857 (1992) (women's right to "bodily integrity" includes a right to make reproductive health decisions).

The Defendants nonetheless insist that they did not violate Plaintiffs' fundamental right to bodily integrity because they did not invade anyone's body. But that simply is not true. As the Supreme Court has recognized, it is possible for a government official to impinge upon a person's fundamental right to bodily integrity without physically touching his or her body. For example, a government official impermissibly curtails a person's fundamental right to bodily integrity by limiting that person's ability to make informed medical decisions. See *Casey*, 505 U.S. at 857. That is precisely what happened here. Defendants here lied and took steps to cover up Nasser's actions, thereby limiting Plaintiffs' ability to make informed decisions about whether and when to seek medical treatment from Nasser.

Defendants also argue they are not liable for violating Plaintiffs' right to bodily integrity because Defendants did not engage in affirmative misconduct. Contrary to their assertion, however, Defendants affirmatively and knowingly failed to disclose knowledge of the allegations and complaints of sexual abuse against Nassar, knowing that young women would continue to treat with him. That triggers constitutional liability.

Finally, the individual MSU Defendants argue that they cannot be held liable for violating Plaintiffs' substantive due process right to bodily integrity, either because they are entitled to qualified immunity or because they were not personally involved in the conduct that injured Plaintiffs. These Defendants are wrong on both fronts.

The doctrine of qualified immunity shields "government officials performing discretionary functions" from liability in cases in which the officials did not have adequate notice that his or her

conduct was unlawful. *Baynes v. Cleland*, 799 F.3d 600, 609–10 (6th Cir. 2015). Thus, qualified immunity shields officials who violate constitutional rights if those rights were not "clearly established" at the time of the violation." *Id*. A right was clearly established if "[t]he contours of the right [were] sufficiently clear that a reasonable official would [have] underst[ood]" that his or her conduct "violate[d] that right." *Id*. at 610.

Sometimes, "[i]n an obvious case," an official can know that her conduct violates constitutional rights, "even without a body of relevant case law." *Sample v. Bailey*, 409 F.3d 689, 699 (6th Cir. 2005); *Grawey v. Drury*, 567 F.3d 302, 313–14 (6th Cir. 2009) ("[T]here need not be a case with the exact same fact pattern or even 'fundamentally similar' or 'materially similar' facts; rather, the question is whether the defendants had 'fair warning' that their actions were unconstitutional.")

Any reasonable university official would have known that his or her conduct violated Plaintiffs' fundamental constitutional right to bodily integrity. Any reasonable officer should have realized that knowingly allowing Nassar to continue to treat girls despite the many complaints of sexual abuse, ignoring those complaints, failing to investigate and then concealing the record of complaints violated the constitutional rights of the young girls who continued to unknowingly treat with Nassar. Thus, the Defendants are not entitled to qualified immunity.

Nor can the Individual Defendants claim that they were not personally involved in the conduct that violated of Plaintiffs' rights.  According to the Complaints, all Defendants received complaints that Nassar was sexually abusing young women, ignored and refused to investigate those complaints, concealed the complaints, lied about their knowledge of the complaint and allowed Nassar to continue to abuse girls under the guise of medical treatment. These and other allegations contained in the Complaints detail how the Defendants were both involved in violations of Plaintiffs' rights and engaged in conduct that went far beyond a mere failure to act. They made decisions that created and

increased the risk of harm to Plaintiffs and subsequently took further action to conceal these dangers from Plaintiffs and the public. This more than satisfies Plaintiffs' burden at this stage.

### B.   The Complaint Sufficiently States a Claim for Government Defendants' Violation of Plaintiffs' Fundamental Constitutional Right to Be Free From State-Created Danger

Plaintiffs have also alleged that Defendants deprived Plaintiffs of their fundamental constitutional right to be free from state-created danger. To establish the claim Plaintiffs must show that Defendants: (1) engaged in affirmative acts that created or increased a risk that Plaintiffs would be exposed to injury or violence; (2) exposed Plaintiffs to a special danger, distinguishable from a risk that affects the public at large; and (3) knew or should have known that their actions specifically endangered Plaintiffs. *Schneider v. Franklin Cty*., 288 F. App'x 247, 252 (6th Cir. 2008).

The Complaints detail affirmative acts taken by the Defendants that created, prolonged, and increased dangers to Plaintiffs that they would not otherwise have faced. Defendants even acknowledge that Plaintiffs alleged that Defendants' actions allowed and prolonged the time that Nassar was permitted to sexually assault girls under the auspices of MSU. These were affirmative actions by Defendants.

The Defendants also argue that Plaintiffs fail to point to a private third-party actor who was likely to and in fact did  harm Plaintiffs as a consequence of state action; but not all decisions regarding state-created danger require a third or private party as the source of potential danger or harm to the plaintiff. Indeed, the Sixth Circuit has applied the state-created danger doctrine in circumstances that did not involve a private third party. In *Schneider,* the Sixth Circuit held that the plaintiff established a claim under the state-created danger doctrine where police officers insisted that she walk on an injured ankle, causing her ankle to break. 288 F. App'x at 253; *see also Stiles ex rel. D.S. v. Grainger Cty*., 819 F.3d 834, 854 (6th Cir. 2016) (articulating the standard merely as "an affirmative act that creates or increases the risk to the plaintiff.")

Other circuits similarly "have not limited the [state-created danger] doctrine to cases where third parties caused the harm," and have found a cognizable state-created danger claim where no third-party harm was involved. See *Estate of Smith v. Marasco*, 318 F.3d 497, 506, 510 (3d Cir. 2003) (holding "a reasonable jury could find that there was a constitutional violation" where plaintiffs' decedent suffered a heart attack brought on by stress following events directly involving state troopers). The Third Circuit in *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996), held that the plaintiff properly stated a claim for relief under a state-created danger theory where police officers left an intoxicated woman to walk home alone on a cold night which resulted in her falling down an embankment and suffering hypothermia. *Id*. at 1201–03. Similarly, in *Munger v. City of Glasgow Police Department*, 227 F.3d 1082 (9th Cir. 2000), the Ninth Circuit concluded that police officers could be liable for a state-created danger claim where they "affirmatively ejected Munger from a bar late at night when the outside temperatures were subfreezing," and Munger ultimately died of hypothermia. *Id*. at 1085, 1087.

As these cases recognize, plaintiffs may state claims for violation of their right to be free from state-created danger when "affirmative conduct on the part of a state actor places a plaintiff in danger," or the official's "affirmative actions . . . significantly increased the risk facing" plaintiff or their decedent. *Penilla v. City of Huntington Park*, 115 F.3d 707, 710 (9th Cir. 1997) (holding state-created danger claim viable against police officers who, after finding a man in grave need of medical care, cancelled a request for paramedics and locked him in his home).

Here, the Defendants actively promoted Nassar as the physician to world class gymnasts, then concealed Nassar's abhorrent behavior, deliberately ignored complaints of sexual abuse and concealed the allegations of sexual abuse. Defendants then exacerbated and prolonged the harm by subsequently making knowingly false statements to patients, parents, investigators and law enforcement which prevented detection of Nassar's misconduct about the long history of complaints

39

about Nasser. Plaintiffs' Complaints sufficiently plead all elements to state a claim for violation of their constitutional right to be free from a state created danger.

Plaintiffs also have alleged facts sufficient to show a "special danger" that placed them "specifically at risk, as distinguished from a risk that affects the public at large." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998). A plaintiff properly alleges a "special danger" where the danger is posed to "to a discrete class of individuals" that the state's actions put at risk. *Schroder v. City of Fort Thomas*, 412 F.3d 724, 729 (6th Cir. 2005).  Here, the possible victims of Nassar's misconduct can be ascertained as those at risk would have been young female athletes sent to him for treatment.

Further, the considerable size of the class does not preclude it from being a "discrete class" distinguishable from the public at large. In *McQueen v. Beecher Community Schools*, 433 F.3d 460, 462–63 (6th Cir. 2006), a teacher left five children alone in a classroom with a sixth student known for his violent tendencies, who ultimately shot and killed the plaintiff's child. The Sixth Circuit concluded that it had "little difficulty assuming that if the relevant group included everyone in the school, the special danger requirement still would be satisfied." *Id*. at 468 (emphasis added).  Here, it was foreseeable who would be injured by the Defendants' actions: those girls who sought medical treatment from Nassar based on his reputation which was promoted by Defendants. The clear foreseeability of the damage inflicted by Nassar lends itself to the notion that the injuries were inflicted upon a discrete, definable class of individuals—not an amorphous general public lacking distinguishing characteristics. See *Morse v. Lower Merion Sch. Dist*., 132 F.3d 902, 914 (3d Cir. 1997) ("[T]here would appear to be no principled distinction between a discrete plaintiff and a discrete class of plaintiffs. The ultimate test is one of foreseeability.") Thus, Plaintiffs have pled each element necessary to establish a claim for a state created danger.

## C.      Plaintiffs Alleged a Plausible Claim for Supervisory Liability

A supervisor has liability for a subordinate's violation of constitutional rights when: (1) ... the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) ... the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) ... there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Johnson v. Harris*, 2009 WL 3126315, at *8 (E.D. Mich. Sept. 28, 2009)).   Thus, "encouragement, authorization, approval, and knowing acquiescence are all sufficient to confer liability." *Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016).

Plaintiffs have alleged that the individual defendants received numerous complaints about Nassar's misconduct and sexual abuse. Defendants do not seem to dispute that this element was adequately pled. However, Defendants claim that their response to those complaints does not amount to deliberate indifference because Plaintiffs did not plead that Defendants authorized, approved or knowingly acquiesced in Nassar's conduct.

However in the context of abuse, a supervisor may incur liability where the individual who engaged in abuse "showed a strong likelihood' that he would attempt to abuse others, such that the "failure to take adequate precautions amounted to deliberate indifference" to the constitutional rights of plaintiffs. *Doe v. Claiborne Cty., Tenn.,* 103 F.3d 495, 513 (6th Cir. 1996).

A school administrator is guilty of deliberate indifference when his or her response or lack thereof "is clearly unreasonable in light of known circumstances." *Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 364 (6th Cir. 2005).   Here, the defendants repeatedly failed to investigate serious allegations of abuse against Nassar. Supervisory liability may arise from the failure to thoroughly investigate prior incidents of misconduct. *Peatross*, 818 F.3d at 238-239; *Coley v. Lucas*

41

*Cty., Ohio*, 799 F.3d 530, 542 (6th Cir. 2015) (liability based on failure to train and supervise subordinate); *Howard v. Knox Cty*, 695 F. App'x 107, 115 (6th Cir. 2017) (Allegation that defendant made "no efforts to investigate, report, train, or terminate Shoemaker upon receipt of numerous complaints from students, parents, and teachers" is alone sufficient to establish a claim for deliberate indifference.); *Adair v. Hunter*, 236 F. Supp. 3d 1034, 1044–45 (E.D. Tenn. 2017)(failure to conduct investigation constitutes "a textbook example of acquiescence to unconstitutional conduct.").

Defendants also claim that Plaintiffs did not adequately plead causation. "Causation in the constitutional sense is no different from causation in the common law sense." *McKinley v. City of Mansfield*, 404 F.3d 418, 438 (6th Cir.2005). An officer may therefore be liable under § 1983 "for the natural consequences of his actions." *Id*. This includes liability for acts giving rise to the ultimate harm, even if the harm is executed by someone else. *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 609 (6th Cir.2007). As the Sixth Circuit has explained: "[C]ourts have framed the § 1983 proximate-cause question as a matter of foreseeability, asking whether it was reasonably foreseeable that the complained of harm would befall the § 1983 plaintiff as a result of the defendant's conduct. Even if an intervening third party is the immediate trigger for the plaintiff's injury, the defendant may still be proximately liable, provided that the third party's actions were foreseeable." *Culp v. Rutledge*, 343 F. App'x 128, 137 (6th Cir. 2009). Here, the inaction of Defendants permitted Nassar to continue sexually abusing young girls under the guise of medical treatment. Dismissal at this stage would be inappropriate.

## VIII.   PLAINTIFFS PLED A PLAUSIBLE CLAIM FOR VIOLATION OF THE TVPA

MSU Defendants have alleged that Plaintiffs have not adequately plead their sex trafficking claims. However, MSU knowingly participated in, and financially benefitted from, the venture of obtaining services from Plaintiffs in violation of the Trafficking Victims Protection Act, 18 USC § 1591, 1595. Multiple investigative bodies have determined that MSU knew of complaints regarding

Larry Nassar's sexual assault over the years. MSU allowed Nassar to continue to treat patients for years after the complaints began, and financially benefitted from the patients that came to the MSU Sports Clinic to be treated by the "Olympic Doctor."

> **A.** **Plaintiffs alleged each element to establish this claim, including Defendants' Participation in a Venture**

Defendants claim that Plaintiffs did not plead that the MSU Defendants "actually participated in a sex-trafficking venture" with Nassar. However, in *Gilbert v. United States Olympic Comm.*, 2019 WL 4727636, *16 (D. Colo 9/27/2019), the court defined venture as "any group of two or more individuals associated in fact, whether or not a legal entity." The Gilbert court further held "that 1589(b) does not require a member of a venture to have committed overt acts…in order for that member to be civilly liable. *Id.* [35] Thus, Defendants did participate in a venture.

In his report and recommendation, the magistrate in *Gilbert v. USOC,* 2019 WL 1058194, *12 (D Colo 2019)[36] identified the elements necessary to establish a violation of Section 1589(b): (1) the party knowingly participated in a venture; (2) the party knowingly benefitted from the venture; (3) the venture has engaged in the providing or obtaining of labor or services in violation of the TVPA; and (4) the party knew or recklessly disregarded the fact that the venture has engaged in the providing or obtaining of such labor or services  The *Gilbert* court  found that 'labor' was defined as "the expenditure of physical or mental effort" and 'services' was defined as "conduct or performance that assists or benefits someone or something." *Id* at *8.

The relationship between Nassar and MSU is a venture because athletes would come to MSU to treat with Nassar and MSU would financially benefit from the reputation of Nassar as a "great'

---

[35] The *Gilbert* court also rejected the holding in *US v Afyare* 632 Appx 272 (6th Cir) on which Defendants rely because that case was interpreting a different section of the TVPA.

[36] In this case, the magistrate issued his report and recommendation which was adopted in part and rejected in part. Plaintiffs have cited from both opinions here.

doctor in the form of funding, media and marketing opportunities, career services and other opportunities. As the court in *Gilbert* stated "…athletes and coaches are involved in a commercial industry that is constantly infused and commingled with money, contracts and terms…every participant is a commercial actor bound by contracts and agreements. Thus, both parties assume risk in this enterprise." *Id* at * 15.

The MSU Defendants cannot dispute that they knowingly benefitted from their relationship with Nassar. When Nassar obtained the sexual services of the Plaintiffs, he was also acting on behalf of the venture, meaning that "but for the venture, [Nassar] would not have obtained—nor have been able to obtain [the Plaintiff's] sexual services." *Id*.

Finally, the MSU Defendants had received complaints regarding Nassar decades prior to these lawsuits being initiated. In fact, in 2014, a formal investigation was conducted by MSU surrounding Nassar's conduct. The TVPA statute "creates liability simply for knowingly benefitting from a venture 'which that person knew or should have known has engaged in an act in violation of the TVPA" *Id* at * 16.

### B.    Claims That Accrued Prior to 2008 Are Not Barred

In *Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994), the court provided a three-step analysis "to determine whether a statute applies to conduct that occurred prior to the enactment of the statute." First, a court must "determine whether Congress has expressly prescribed the statute's proper reach." *Id.* If so, Congress' intent is given effect. Second, if the statute does not contain such a command, "the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." Third, if the statute would have retroactive effect, the Supreme Court's "traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result." (*Id.*)

In *Gilbert, supra*, the court found that "as long as a claim was unexpired at the time Congress extended the relevant statute of limitations, applying that statute 'does not increase a party's liability for past conduct.'" Therefore, any of the claims that were unexpired at the time of the amendment should be considered timely and not expired. 18 USCS Section 1595 (c)(2) reads, " no action may be maintained under subsection (a) unless it is commenced not later than the later of: 10 years after the victim reaches 18 years of age, if the victim was a minor at the time of the alleged offense." Therefore, those cases that may have been time barred pre-amendment, would be considered timely and not expired under these rules.

## IX.   PLAINTIFFS PROPERLY ALLEGED PLAUSIBLE VIOLATIONS OF ELLIOTT-LARSEN

The Plaintiffs have properly alleged claims of sexual harassment against Defendants in violation of the education and public accommodations provisions of the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37. 2401; MCL 37. 2301. ELCRA provides that discrimination on the basis of sex includes sexual harassment. MCL 37.2103. As defined in ELCRA, a hostile environment is "conduct or communication [which] has the purpose or effect of substantially interfering with an individual's employment, public accommodations or public services, education or housing, or creating an intimidating hostile or offensive employment, public accommodations, public services, educational or housing environment." MCL 37.2103(i). To establish a claim of a sexually hostile environment, Plaintiffs must demonstrate that:

(1)   They belong to a protected group;
(2)   They were subjected to communication or conduct on the basis of sex;
(3)   They were subjected to unwelcome sexual conduct or communication;
(4)   The unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the provision of the public services **or created an intimidating hostile or offensive environment**; and
(5)   The defendants had actual or constructive notice of the hostile environment and failed to take appropriate remedial action.

*Radtke v Everett* 442 Mich 368, 382 – 3 (1993); *Chambers v Trettco* 463 Mich 297, 311 (2000).

Plaintiffs' pleadings satisfy these elements. In their complaints and clarified in the proposed amendments Plaintiffs alleged that they were young women and girls who were subjected to unwelcome sexual conduct by Defendant Nassar. Further Plaintiffs alleged that Nassar's sexual assaults created a hostile and offensive environment. Finally, Plaintiffs have all alleged that Defendants had notice of the sexually hostile environment and failed to take prompt and appropriate remedial action. To the contrary, the Plaintiffs pled that despite repeated complaints and notice of Nassar's sexual abuse of the girls, they ignored the complaints, failed to investigate and instead buried the complaints and allowed Nassar to continue to abuse these girls for decades.

Defendants attack Plaintiffs' pleadings on several grounds. First Defendants allege that to allege a claim under the Article 4 of ELCRA, the Plaintiffs must be students. However, that requirement is not contained anywhere in the language in ELCRA. MCL 37.2402 prohibits an educational institution from discriminating "against an **individual** in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of… sex." Thus, by its plain language, discrimination against any individual by an educational institution is prohibited, whether or not that individual is a student. The Plaintiffs need not have been students to have discriminated against and sexually harassment when receiving alleged medical treatment from Nassar, which was a "service, activity or program" provided by MSU and its agents.

Next, Defendants contend that Plaintiffs cannot establish their ELCRA public accommodation claim because they cannot allege that Nassar's conduct interfered with their receipt of services. However, such proof is not required. To establish their claims, Plaintiffs must only show that the sexual harassment was sufficiently severe or pervasive so that it had the purpose or effect of subjecting them to a "intimidating, hostile and offensive environment." MCL 37.2103(iii). *Radtke,*

*supra* at 395.[37]Moreover, even if Plaintiffs had to demonstrate that the harassment interfered with their use of public service, their pleadings satisfy this standard. See *KS v Detroit Public Schools* 2015 WL 4459340 (ED Mich 2015), the court found that an "interference with services" when a plaintiff who had intended to attend college is unable to concentrate in school and fails to go to college, his access to services is impacted. Here Plaintiffs have detailed the impact that Nassar's misconduct had on them, sufficient to allow further discovery in this case.

Defendants also bizarrely contend that Plaintiff did not plead respondeat superior. "Respondeat superior liability exists when the defendant had sufficient notice of the harassment and failed to take adequate corrective action." *Neal v MDOC 2009* WL 187813 at *2 (Mich App 2009). The "notice of a hostile environment may be actual or constructive." *Sheridan v. Forest Hills Pub Sch*, 247 Mich App 611 (2001).

Plaintiffs prevail if the defendants "knew or should have known" of the harassment. *Sheridan v. Forest Hills Pub Sch*, 247 Mich App 611, 621 (2001). In *Chambers, supra at 319*, the Michigan Supreme Court held that "notice of sexual harassment is adequate if, by an objective standard, the totality of the circumstances were such that a reasonable [person] would have been aware of a substantial probability that sexual harassment was occurring." When an employer imposes a duty to report sexual misconduct and anyone included in that reporting duty[38] becomes aware of the misconduct, the employer has actual notice sufficient to satisfy the respondeat superior test. That is true because by implementing such policy, "the employer has itself answered the question of when it

---

[37] The cases cited by Defendants are distinguishable, so those plaintiffs did not allege that the Defendants violated ELCRA by subjecting them to a "intimidating, hostile and offensive environment." See e.g. *Dockweiler v Wentzell,* 425 NW 2d 468 (1988); *Wilson v City of Detroit,* 2001 WL 760020 (2001)

[38] MDOC Policy 03.03.140 mandates that "all employees shall immediately report *any knowledge, suspicion or information regarding allegations of* [sexual] conduct prohibited by this policy to appropriate supervisory staff" *with or without a report* of a prisoner.

would be deemed to have notice of the harassment sufficient to obligate it or its agents to take prompt and appropriate remedial measures." *Clark v. United Parcel Serv, Inc*, 400 F3d 341, 350 (6th Cir 2005).

Meanwhile, harassment that is pervasive "gives rise to the inference of knowledge or constructive knowledge" sufficient to assign liability. *Sheridan, supra at* 628. Both State and Federal law underscore that, "The repeated nature of the harassment or its intensity constitutes evidence" that the defendant "knew or should have known of its existence". *Nat'l RR Passenger Corp v. Morgan*, 536 US 101, 115 (2002). "If the harassment complained of is so open and pervasive that the [Defendants] should have known had it but opened its… eyes, it is unreasonable not have done so, and there is constructive notice." *Sharp v. City of Houston*, 164 F3d 923, 930 (5th Cir 1999); *See* also *Jackson v. Quanex*, 191 F3d 647, 663 (6th Cir 1999) (where harassment is pervasive, court may impute constructive notice).

Contrary to this legal authority, Defendants argue that Defendants had to have notice that the individual Plaintiffs were being subjected to sexual harassment. This argument has been soundly rejected. The Court of Appeals considered this very issue and rejected Defendants' premise. *Perez v. Ford Motor Co* 2006 WL 1540764 *4 (1996) (finding that "the general work environment is the key, not the specific acts directed toward plaintiff."); *Woods v. MDOC* 2018 WL 1611444 (Mich App 2018). Here the Defendants had notice, both actual and constructive, of the likelihood and probability that sexual abuse of the Plaintiffs would and did occur.

Further Plaintiffs all alleged that Defendants failed to take remedial action upon receiving complaints of Nassar's sexual abuse/harassment of girls that he was purportedly treating. Defendants contend this pleading is insufficient because those who received the complaints were low level and insufficient to put Defendants on notice of the harassment. Plaintiffs' complaint document that coaches, athletic trainers and clinical psychologists received complaints. Plaintiffs also have alleged

that investigators, other doctors at the sports clinic and even deans had notice of Nassar's sexual abuse/harassment but did nothing to properly investigate or put an end to the abuse. These are all individuals who could and/or did participate in the decision-making about Nassar's ability to continue to have unfettered access to young women who he continued to sexually assault for decades. Thus, Plaintiffs pled respondeat superior and all other elements for required to establish a sexual harassment/hostile environment claim under ELCRA.

Finally, Defendants argue that Plaintiffs' aiding and abetting claim fails because they cannot establish a conspiracy. Yet this is not an element of an aiding and abetting claim. "A person shall not ... [a]id, abet, incite, compel, or coerce a person to engage in a violation of this act." MCL § 37.2701(b). The Michigan Court of Appeals has followed the Third Circuit's test to state a cognizable claim of aiding and abetting under the ELCRA. To state a valid claim, a plaintiff must show that: (1) the party aided by the defendant performed a wrongful act that caused an injury, (2) the defendant had general awareness "of his role as part of an overall illegal or tortious activity at the time that he provide[d] the assistance," and (3) the defendant knowingly and substantially assisted the principal act of discrimination. *Fortenberry v. Jenkins-Dick Corp.*, No. 242225, 2003 WL 22849770, at *2 (Mich. Ct. App. Dec. 2, 2003) (citing *Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 127 (3d Cir. 1999). Plaintiffs pled each of these elements. Nassar was able to continue to sexually harass girls because Defendants aided and assisted him by failing to stop him despite knowing for decades of his abuse. This is sufficient.

In their original complaints, proposed amended complaints, and again in this brief, Plaintiffs have alleged and shown ample evidence (not mere basis for inference) that MSU individuals received complaints about Nassar sexually assaulting athletes, ignored it, and then covered it up.  At the 12(b)(6) stage, factual allegations must simply be enough to raise a right to relief above the

speculative level on the assumption that all the allegations in the complaint are true. *Twombly,* 550

U.S. at 555. The allegations in the complaints as well in this brief do just that.

## X.    PLAINTIFFS PROPERLY PLED VIOLATIONS OF THE CHILD PROTECTION ACT

The United States Supreme Court has long recognized that a state has an interest in protecting

the welfare of children and in seeing that they are safeguarded from abuses which might prevent their

growth into free and independent, well-developed citizens. *Ginsberg v. New York,* 390 U.S. 629

(1968). The Child Protection Law's purpose is limited to "protecting children in situations where

abuse and neglect frequently go unreported, *i.e.*, when perpetrated by family members or others with

control over the child." *People v. Beardsley*, 263 Mich App 408 413 (2004).

The instant case is the exact type of case that the CPL seeks to address—a case where

Defendant Nassar as a caregiver and doctor for the children was himself a mandated reporter.  *Id.*

The MSU Defendants were statutorily obligated to report Nassar's sexual abuse and should be held

liable for failing to do so.

### A.    Plaintiffs Have Standing to Pursue A CPL Claim

MCL § 722.633(1) provides: "A person, required to report an instance of suspected child

abuse or neglect, who is required to report under this act and who failed to do so, is civilly liable for

the damages *proximately caused* by the failure."

Defendants argue that Plaintiffs lack standing to pursue CPL claims because "Michigan's

child abuse reporting statute creates a private right of action *only* in an identified abused child [about

whom no report was made]." *Murdock v. Higgins*, 454 Mich 46; 559 NW2d 639, 646 (1997)

Defendants contend that there is no indication that any MSU individuals had contact with any of the

minor Plaintiffs, or even knew they were patients of Nassar prior to these proceedings. Defendants

argue that none of the Plaintiffs allege that they reported Nassar's abuse to the MSU Defendants while

50

they were a minor, or that any of the MSU Defendants failed to report suspected abuse of that minor Plaintiff.

Defendants' contention is contradicted by the Amended Complaints which specifically alleges that in or around 1997 and/or 1998 Larissa Boyce and Jane B8 Doe reported sexual assault, abuse, and molestation by Defendant Nassar to Defendant Kathie Klages.  Defendant Klages refused to report the incident and instead intimidated, humiliated, and embarrassed Larissa Boyce and Jane B8 Doe.  As a result of MSU gymnastics head coach Klages being informed by Boyce of Defendant Nassar's conduct, Jane B8 Doe was asked by Klages if Nassar had performed the "procedure" involving digital vaginal and anal penetration on Jane B8 Doe, and Jane B8 Doe responded in the affirmative. Instead of reporting this suspected abuse to CPS, Klages told Jane B8 Doe that there is no reason to bring up Nassar's conduct.  Thus, contrary to Defendants' claim Defendant Klages had contact with Jane B8 Doe and knew she was a patient of Defendant Nassar prior to these proceedings. Defendant Klages was statutory obligated to report this suspected abuse.

The Amended Complaints also specifically allege that in 2004, Kyle Stephens–then 11 or 12 years old–was sexually assaulted and abused during "treatment" by Defendant Nassar and reported Defendant Nassar's conduct to Defendants' employees, including Defendant Gary E. Stollak. Defendant Stollak did not report the abuse to law enforcement or to child protective services even though he was statutorily obligated to do so.

In *Phillips v. Deihm*, 213 Mich App 389, 396 (1995) the Michigan Court of Appeals stated that mandated reporters have a statutory duty to intervene to eliminate *any* unreasonable risk to a child victim of suspected abuse or neglect when able to do so and had or should have had knowledge of the risk.  MCL § 722.622(v)(ii); M.S.A. § 25.248(2)(v)(ii).  In this case there is no question that the Defendants should have reported the abuse in this case.

Additionally, MCL § 722.633 does not limit the damages owed to a Plaintiff. The statute states that the person who fails to report suspected abuse is liable for damages proximately caused by the failure to report. The statute does not limit the liability only to the person to whom the failure to report relates, as Defendants suggest. In *Nation v W.D.E. Electric Company,* 454 Mich 489, 504 (1997), the Supreme Court noted: "When this Court is interpreting a statute, its singular role is to give effect to the intent of the Legislature." In resolving disputed interpretations of statutory language, it is the function of a reviewing court to effectuate the legislative intent. *Hiltz v. Phil's Quality Market,* 417 Mich 335, 343, 337 NW2d 237 (1983). If the language used is clear, then the Legislature must have intended the meaning it has plainly expressed, and the statute must be enforced as written. *Id.* Here, the statutory language clearly states that the person who fails to report suspected abuse is liable *for the damages proximately caused by the failure*. There can be no question that Defendants' failure to report suspected abuse allowed Defendant Nassar's abuse to continue unfettered directly resulting in the abuse of the Plaintiffs. Thus, if this court were to insert unwritten limitations into the statutory language of MCL § 722.633, this court would not be giving proper effect to clearly stated legislative intent.

Moreover, well settled caselaw applying the CPL has long established the protection of as yet unharmed children who are at risk of harm from a known abuser. "[T]he doctrine of anticipatory neglect recognizes that '[h]ow a parent treats one child is certainly probative of how that parent may treat other children.'" *In re AH*, 245 Mich App 77, 84 (2001) **The doctrine applies even where abuse is directed at a child other than a parent's own child.** *In re Powers,* 208 Mich Ap 582, 592–593 (1995), superseded by statute on other grounds as stated in *In re Jenks*, 281 Mich. App. 514, 518 n 2 (2008). In fact, this doctrine is so persuasive that the Michigan Court of Appeals has recognized that "*Abuse or neglect of the second child is not a prerequisite for jurisdiction of that child and application of the doctrine of anticipatory neglect.*" *In re Gazella*, 264 Mich App 668, 680–

52

681 (2005) (emphasis added), superseded in part on other grounds as stated in *In re Hansen*, 285 Mich App 158, 163 (2009), vacated on other grounds 486 Mich 1037 (2010).   The intent of the reporting requirement includes protecting children in situations like the instant case where abuse and neglect frequently go unreported or where someone might have a personal or financial interest in covering up the abuse. Since a trial court can assert jurisdiction over child who has not been abused but is merely at risk of abuse, it would stand to reason that based on the doctrine of anticipatory abuse, and the established purpose of the CPL to prevent abuse, the court can and should also hold a mandated reporter civilly liable for failing to report suspected abuse.

Additionally, Defendants' challenge to Plaintiffs' standing is inconsistent with the Michigan Supreme Court's prior holdings in child protection cases. As in *In re A.H.*, 245 Mich App 77, 81 (2001), the Plaintiffs in this case have an interest in the issue that should ensure them sincere and zealous advocacy.  To have standing, a party must have an interest in the outcome of the litigation that will ensure the party's sincere and vigorous advocacy. *Kuhn v. Secretary of State,* 228 Mich App 319, 333, 579 NW2d 101 (1998). "The plaintiff must also demonstrate that his substantial interest will be adversely affected in a manner distinct from the citizenry at large, i.e., an actual injury or likely chance of immediate injury different from the public." *Detroit Fire Fighters Ass'n v. Detroit,* 449 Mich 629, 643, 537 NW2d 436 (1995). The interests of the Plaintiffs in this case will be adversely affected in a manner distinct from the citizenry at large because they will suffer the actual injury of knowing that the adults statutorily mandated to protect them when they were vulnerable children disregarded their statutory duty and they suffered because of it.  Unlike the citizenry at large, the Plaintiffs in this case would not have suffered had Defendants reported the suspected abuse of Defendant Nassar who would have been investigated by DHHS.

Finally, Defendants also argue that if the court recognizes that they had standing and were statutory obligated to report the child abuse perpetrated by Defendant Nassar, the individual MSU

Defendants need not have reported the abuse because they were not obligated to report the abuse of adults.   This claim is unpersuasive because, contrary to Defendants' claim, as the Amended Complaints allege, the majority of the sexual abuse alleged occurred at the time the Plaintiffs were minor children.   The Amended Complaints clearly state: Defendants Klages, Strampel, Kovan, and Stollak were mandatory reporters *during the time* Defendant Nassar was engaged in child abuse or child neglect. The Amended Complaints also specifically allege that an overwhelming majority of the Plaintiffs were minor children at the time they were sexually abused by Defendant Nassar and the allegations involve injuries of a personal and sensitive nature.

### B.      The CPL Applies to Plaintiffs' Allegations

#### i.      S*uspected* abuse triggers the duty to report

The notice requirements under CPL neither requires actual knowledge nor requires mandated reporters to report specific abuse. Rather, MCL § 722.623 requires that statutorily mandated reporters have "reasonable cause to suspect child abuse or neglect" for the triggering of the duty to immediately report suspected abuse or neglect.

The statute deliberately only requires a mere suspicion or concern so as to afford the highest protection to a vulnerable group.   Thus, even if the individual Defendants did not actually know whether any or all of the Plaintiffs were in fact sexually abused by Defendant Nassar, they were nonetheless obligated to report *any* suspicions of abuse, which if discovered and substantiated would have prevented further incidents of abuse.

In this case, there was ample reasonable cause to suspect child abuse or neglect.   As the Complaints allege, the individual MSU Defendants had previously received strikingly similar complaints of abuse by Defendant Nassar from other patients, students, and student athletes and knew that the appropriateness of his "treatment[s]" had been questioned in the past.   Moreover, the previous repeated complaints made about Defendant Nassar dating back to 1997 regarding sexual, battery,

molestation and non-consensual sexual touching during "treatment" were more than sufficient to warrant a report to CPS for further investigation.

Further, the Michigan Court of Appeals has held that a person required to report under MCL 722.623 is not free to arrogate to himself the right to foreclose the possibility of a legal investigation by the state. *People v. Cavaiani,* 172 Mich App 706, 715; 432 N2d 409 (1988). Even if a mandated reporter personally believed that there was no child abuse, he is still required to report the possibility and allow the state to investigate because the state has different interests. *Id.* Thus, the individual Defendants were statutorily obligated to report suspicions of abuse.

## ii. Defendants were mandated child abuse reporters by law

The CPL provides that physicians, psychologist, counselors and teachers are mandatory reporters. MCL 722.623(1)(a) casts a broad net helps to ensure that suspected abuse will get reported.

Defendants do not challenge the fact that the majority of them were mandated reporters. They merely argue that as a gymnastics coach, Klages is not a mandated reporter under the CPL. Contrary to Defendants' claim, like the other Defendants, Klages was in fact a mandatory reporter. As a gymnastics coach, Klages was also a teacher of gymnastics. Under MCL 722.623(1)(a), teachers are mandatory reporters. Even if this court were not to recognize Klages as a teacher of gymnastics, Plaintiffs have set forth a valid claim under the CPL where the individual Defendants, including medical staff like Dr. Strampel, Dr. Kovan and Dr. Stollak, were mandatory reporters with statutory obligations to report Defendant Nassar's abusive conduct. Pursuant to *Murdock, supra*, there can be no question that the individual MSU defendants had a duty to report suspected abuse because these individuals were responsible for the Plaintiffs' health and welfare when they were children. *Id.*

## iii. Defendant Nassar perpetrated child abuse

Defendants also attempt to mislead this court into believing that Defendants were not obligated to report the abuse perpetrated by Defendant Nassar by suggesting that he did not commit

child abuse as defined by the statute. Based on these definitions, it is clear that Defendant Nassar committed child abuse.

MCL 722.622(g) defines child abuse as **harm** or threatened harm **to a child's health or welfare by** a parent, a legal guardian, or **any other person responsible for the child's health or welfare**, or by a teacher or teacher's aide, **that occurs through nonaccidental physical or mental injury; sexual abuse; sexual exploitation; or maltreatment**.

There is no question that Defendant Nassar perpetrated harm to children's welfare through nonaccidental physical and mental injury, sexual abuse, sexual exploitation and maltreatment. As alleged in the Complaints, under the guise of treatment, many individuals, including Plaintiffs, were sexually assaulted, abused and molested by Defendant Nassar by vaginal digital penetration, without the use of gloves or lubricant, and by touching and groping their genitals and breasts. Defendant Nassar pleaded guilty to first-degree criminal sexual conduct in Ingham and Eaton County Circuit Court.

Defendants challenge Plaintiffs' assertion that the imposition of this duty to report pertained to Defendant Nassar by arguing that Nassar does not meet the statutory definition of a "person responsible" for Plaintiffs' health or welfare. Defendants argue that Nassar was not a "non-parent adult" responsible for the children's health and welfare. However, Defendants' claim is without merit.

Contrary to Defendants' claim, in this case, as a "nonparent adult." MCL 722.622 defines the term "nonparent adult" as "a person who is 18 years of age or older and who, regardless of the person's domicile, meets all of the following criteria in relation to a child: (i) Has substantial and regular contact with the child;(ii) Has a close personal relationship with the child's parent or with a person responsible for the child's health or welfare; (iii) Is not the child's parent or a person otherwise related to the child by blood or affinity to the third degree.

56

At the time that Defendant Nassar perpetrated sexual abuse against the Plaintiffs, they were minor children, Nassar was over 18 years of age, and Nassar had substantial and regular contact with the children he was treating.   MCL 722.622(v)(i). Defendant **Nassar also had a close personal relationship with the children's parents or with the person responsible for their health and welfare.**   A special, confidential, and fiduciary relationship was created between Plaintiffs and Defendant Nassar when Plaintiffs sought medical treatment from him.   As also noted in the Complaint, Nassar's close personal relationship with the children and their families was evidenced by the gifts he gave the children. There is no question Defendant Nassar had a close personal relationship with the parents and caregivers of the children he treated and abused. Finally, under MCL 722.622(v)(iii), Defendant Nassar is not the parent of any of the child Plaintiffs he abused or otherwise related to them.   As a result, the individual MSU Defendants had a duty to report Nassar's abuse. Plaintiffs satisfies each element of a claim for violation of the CPL. The motion to dismiss should be denied.

## XI.   PLAINTIFFS' CLAIMS ARE NOT TIME-BARRED

The MSU Defendants move to dismiss this action based on hyper-technical perversions of Michigan's statute of limitations. There are four levels of inquiry relating to untimeliness arguments asserted by MSU.

First, there are Plaintiffs who can take advantage of the tolling provisions of MCL 660.5851 because they were assaulted when they were minors and filed suit against MSU before their 19th birthday. For this group of cases there are no untimeliness issues.

Second, there are Plaintiffs who can take advantage the tolling provisions of MCL 600.5851b (1) or (2) because they were victims of a criminal sexual assault when they were minors and they brought suit the after turning 19 but  before reaching the age or 28 or within 3 years of discovering the criminal sexual assault which caused their injuries whichever is later.

Third, there are Plaintiffs who can take advantage of tolling provisions of MCL 600.5851b(3) because they were minors when assaulted by Nassar after December 31, 1996 but before June 12, 2016 and they commenced an action after June 12, 2018 but before September 12, 2018.

Fourth, there are Plaintiffs who are not covered by the above statutory tolling sections because they were not minors when assaulted but nonetheless assert their suits were timely because they allege that MSU fraudulently concealed from them its responsibility for enabling and covering up Nassar's crimes.[39]

### A.    Plaintiff's Claims Accrued When They Learned of MSU's Deception

The question at the heart of MSU's motion is when the two-year clock on the plaintiffs' Title IX claims began to run. The answer is governed by the federal accrual rule. A "statute of limitations begins to run" only once a "reasonable person knows, or in the exercise of due diligence should have known, both his injury" **and the defendant's role in causing that injury**. *Bishop v. Children's Ctr. for Developmental Enrichment*, 618 F.3d 533, 536 (6th Cir. 2010); see also *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001); *Tackett v. Marion County Fair Bd.*, 272 F. Supp. 2d 686, 689 (6th Cir. 2003).

Contrary to MSU's contention, claims accrued when the plaintiffs (1) knew or should have known they were abused and (2) knew or should have known of MSU's role in causing that abuse.[40] See *Sowers v. Bradford Area Sch. Dist.*, 694 F. Supp. 125, 132 (W.D. Pa. 1988), aff'd, 869 F.2d 591

---

[39] At this point, Plaintiffs have essentially provided a legal analysis because it is unclear which limitations provision is applicable to each Plaintiff. In addition, this is a highly factual analysis, not susceptible to resolution in a motion to dismiss.

[40] See, e.g., *King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754, 762 (5th Cir. 2015) ("[A] plaintiff's awareness [for a claim to accrue] encompasses two elements: (1) the existence of the injury; and (2) causation, that is, the connection between the injury and the defendant's actions."); *Varnell v. Dora Consol. Sch. Dist.*, 756 F.3d 1208, 1216 (10th Cir. 2014) (claim accrues when "plaintiff knew or should have known the facts necessary to establish her cause of action, such as the fact that a surgeon left a sponge in the plaintiff's abdomen after an operation").

(3d Cir. 1989) (vacated on other grounds) (denying motion to dismiss on statute of limitations grounds because factual questions remained as to whether student knew or should have known school district caused student's injury); *T.R. v. Boy Scouts of Am.*, 181 P.3d 758, 763 (Or. 2008) ("[T]he limitations period begins to run as to each defendant when the plaintiff discovers, or a reasonable person should have discovered, that defendant's causal role.") (emphasis added); see also *Browning v. Burt*, 613 N.E.2d 993, 1005 (Ohio 1993) (holding under state accrual rule that statute of limitations for medical malpractice claim against hospital—as opposed to doctor—didn't start running until plaintiffs saw TV program and learned that their doctor "may have committed a number of harmful . . . surgeries upon a number of unsuspecting patients" such that the hospital's credentialing practices "could reasonably be brought into question").

The question of what a plaintiff knew, or should have known, is a fact-intensive inquiry ordinarily "reserved for the jury except when the facts are so clear that reasonable minds cannot differ."  In re *Arctic Exp. Inc.*, 636 F.3d at 802; see also *Kehoe Component Sales Inc. v. Best Lighting Prods., Inc.*, 933 F. Supp. 2d 974, 1016 (S.D. Ohio 2013) ("[T]he determination of when a cause of action accrues is to be decided by the trier of fact."). And, on a motion to dismiss, the facts are limited to those pleaded in the complaint. Thus, to succeed on its motion, MSU must demonstrate that the allegations of the complaint affirmatively show that no reasonable juror could disagree with the contention that plaintiffs knew or should have known of their abuse and MSU's role in causing it.

### B.   Minor Plaintiffs' Claims Are Timely Under MCL 600.5851 As Are Claims Filed Before One-Year of Majority

Despite Defendants' attempts, all plaintiffs cannot be lumped together is a single claim that their claims are untimely. For the plaintiffs who were minors at the time that their complaints were filed or who were not yet 19 years of age, those claims are absolutely timely under Michigan law. The applicable statute is MCL 600.5851 and states in relevant part:

(1) Except as otherwise provided in subsections (7) and (8)[41], if the person first entitled to make an entry or bring an action under this act is under 18 years of age or insane at the time the claim accrues, the person or those claiming under the person shall have 1 year after the disability is removed through death or otherwise, to make the entry or bring the action although the period of limitations has run. This section does not lessen the time provided for in section 5852.

The savings provision of Sec. 5851(1) applies to all claims who are under 18 years of age or insane. *Doe v. Roman Catholic Archbishop of Archdiocese of Detroit,* 264 Mich. App. 632, 639 (2004). As long as the plaintiff was under the age of majority when the claim accrued, the statute of limitation was tolled until one year after the disability of infancy was removed. *Id.*

Applying Sec. 5851, many of the complaints that remain are not barred by the statute of limitations. Plaintiffs timely filed their action if they were minors when the claim accrued and minors when the action was filed. Plaintiffs also timely filed their action if they were minors when the claim accrued and filed the action before their nineteenth birthday.

C.    **Plaintiffs' Claims Are Timely Under MCL 600.5851b**

The Michigan Legislature passed Senate Bill 872 ("SB 872"), which eventually was signed into law as PA 183 and codified as MCL 600.5851b. PA 183 was enacted to protect Michigan's vulnerable children and provide redress against Defendants who allowed them to be sexually molested.

MCL 600.5851b governs all claims against MSU and the MSU Individual Defendants and retroactively applies to Plaintiffs' claims. The relevant language of the statute states:

(1) Notwithstanding sections 5805 and 5851,[1] an individual who, while a minor, is the victim of criminal sexual conduct may commence an action to recover damages sustained because of the criminal sexual conduct at any time before whichever of the following is later:
(a) The individual reaches the age of 28 years.

---

[41] The two exceptions referenced in subsections (7) and (8) are not applicable to this Court's analysis as those claims pertain to medical malpractice actions, which are not alleged here.

(b) Three years after the date the individual discovers, or through the exercise of reasonable diligence should have discovered, both the individual's injury and the causal relationship between the injury and the criminal sexual conduct.
MCL 600.5851b(1).

The Legislature's decision that Section 5851 was to be provided retroactivity is embodied in subsection (3) of that statute. As subsection (3) directs, the statute created a 90 day "window" from June 12, 2018 through September 10, 2018 in which survivors of sexual abuse as a minor could file claims that may otherwise be barred statutes of limitations if the sexual abuse occurred after December 31, 1996 but prior to June 12, 2016[42] and other conditions are met. *Id.* Applying this window, all plaintiffs who were abused as a minor, and who were under 28 years old at the time when their complaint was filed in September, 2018, have asserted timely claims.

Defendant's contention that Section 5851 was not intended to be applied retroactively is unsupported by the language of the statute and the rules of statutory analysis regarding retroactive application. These rules were recently discussed in *Buhl v. City of Oak Park*, 2019 WL 4126130 (Aug. 29, 2019):

> First, is there specific language in the new act which states that it should be given retrospective or prospective application. Second, a statute is not regarded as operating retrospectively solely because it relates to an antecedent event. Third, a retrospective law is one which takes away or impairs vested rights acquired under existing laws, or creates a new obligation and imposes a new duty, or attaches a new disability with respect to transactions or considerations already past. Fourth, a remedial or procedural act which does not destroy a vested right will be given effect where the injury or claim is antecedent to the enactment of the statute.

*Buhl* at *4.

---

[42] The retroactive window afforded by MCL 600.5851b(3) is limited to sexual abuse that occurred after December 31, 1996 but prior to June 12, 2016. Plaintiffs' Complaints do not need to rely on the retroactivity afforded by MCL 600.5851b(3) for abuse that occurred after June 12, 2016; those claims are timely even if the Court applies Michigan's general personal injury statute of limitations, which is 3 years. All claims for abuse after June 12, 2016 would be timely until at least June 13, 2019. *See* MCL 600.5805(2).

Applying each of the rules of statutory analysis supports the retroactive application of the statute. Looking to the first factor – the language of the statute – supports retroactive application. Here, by creating the window through which potentially expired claims could be resurrected in subsection (3), the Legislature was clearly indicating that it intended for retroactive application. In fact, when authoring the statute, the Legislature chose to reach all of the way back to 1996 when looking at claims: "while a minor, was the victim of criminal sexual conduct after December 31, 1996 but before 2 years before the effective date of the amendatory act that added this section may commence an action to recover damages sustained because of the criminal sexual conduct within 90 days after the effective date of the amendatory act that added this section."

Rule 3 states that "[i]f the retroactive application of a law would take away or impair vested rights, then its retroactive application is prohibited by rule three." Here, retroactive application would have no such impact. As to the fourth rule, "a remedial or procedural act which does not destroy a vested right will be given effect where the injury or claim is antecedent to the enactment of the statute." *In re Certified Questions*, 416 Mich. 558, 572 (1982) This rule supports retroactivity since it would not destroy – but save – a vested right of action.

Applying the rules related to prospective/retroactive application, it is apparent that the Legislature desired retroactive application. The language indicates a desire for retroactive application. The purpose of the statue indicates a desire for retroactive application. It did not create a new cause of action. Instead, it sought to adjust a perceived inequity in the law that prevented victims from vindicating legal rights previously bestowed to them. The function of the statute – to restore and not destroy a vested right – supports a desire for retroactive application. Defendants' argument that the statute only applies prospectively should be rejected by this Court.

Defendants' contention that Section 5851 only applies to Nassar is also unsupported by the language of the statute. The primary purpose of statutory interpretation is to ascertain and give effect

to the intent of the Legislature. *Karpinsky v. St. John Hosp. – Macomb Ctr. Corp.,* 238 Mich. App. 539, 542-543, 606 N.W2d 45 (1999). When faced with questions of statutory interpretation, this Court must first examine the specific language of the statute, giving the statutory language its ordinary and generally accepted meaning, *Depyper v. Safeco Ins. Co. of America,* 232 Mich. App. 433, 438, 591 N.W.2d 344 (1998). When construing a statute, the court should presume that every word has some meaning and should avoid any construction that would render the statute, or any part of it, surplusage or nugatory. *Helder v. North Pointe Ins. Co.,* 234 Mich. App. 500, 504, 595 N.W.2d 157 (1999). Where the statutory language is clear and unambiguous, a court must apply it as written. However, if the wording is susceptible to more than one reasonable interpretation, judicial construction is appropriate. *Karpinsky,* 238 Mich. App. At 543.

Defendants' position that this Section 5851b only applies to the actual perpetrator of the sexual abuse is unsupported by the language adopted in subsection (1). The statute states: "an individual who, while a minor, is the victim of criminal sexual conduct may commence **an action** to recover damages sustained **because of the criminal sexual conduct** at any time before whichever of the following is later." Emphasis added. The statute does not say that the action is limited to the assailant. The statutes does not limit itself to the act of the sexual assault. The statute does not except claims of failure to protect or warn. The language is intentionally broad. It is intentionally broad because it was intentionally authored to apply to both the assailant and individuals who were in a position to prevent the abuse.

Defendants looks to subsection (3) to argue that the claims are only limited to the assailant. However, Defendants are confusing term "defendant" in this action with "defendant" in the sense of an action for criminal sexual misconduct. Subsection (3) states: "if the person alleged to have committed the criminal sexual conduct was convicted of criminal sexual conduct against any person under section 520b of the Michigan penal code, 1931 PA 328, MCL 750.520b, and the defendant

63

admitted either of the following…" The use of the word here is used in the context of a penal defendant, or the assailant. This is confirmed subsection (3)(a), which states "the defendant was in a position of authority over the victim as the victim's physician and used that authority to coerce the victim to submit." The term "victim" is also frequently used in penal proceedings. While subsection (2) is clear that a conviction is not required, the Legislature was clearly drawing from criminal contexts in formulating this civil statute. However, as remains clear from subsection (1), there is nothing in the statute that intended the scope of prospective defendants to only be the assailant.

Considering the authorities cited above, Plaintiffs claims are timely under Section 5851b. The Legislature spoke. Through its words and actions, it acknowledged the difficulties and trauma that victims of sexual assault endure and how those difficulties may prevent them from acting as quickly as some other litigants. This legislature was intended to apply retroactively and intended to apply to all MSU-related defendants here. Defendants' request for dismissal in this regard should be denied.

### D.      Plaintiffs' Claims Are Timely Under MCL 600.5855

Plaintiffs' pleadings also invoke Michigan's fraudulent concealment doctrine, which extends that statute of limitation for a period of two years from when discovery of a fraudulently concealed action is made. The relevant language of the statute states:

> If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations.

MCL 600.5855.

Generally, Section 5855 requires "concealment by the defendant of the existence of a claim or the identity of a potential defendant," *McCluskey v. Womack,* 188 Mich. App. 465, 472, 470 N.W.2d 443 (1991), and the "plaintiff must plead in the complaint the acts or misrepresentations that

comprised the fraudulent concealment." *Sills v. Oakwood Hosp.,* 220 Mich. App. 303, 310, 559 N.W.2d 348 (1996). "Fraudulent concealment means employment of artifice, planned to prevent inquiry or escape investigation, and mislead or hinder acquirement of information disclosing a right of action. The acts relied on must be of an affirmative character and fraudulent." *Tonegatto v. Budak,* 112 Mich. App. 575, 583, 316 N.W.2d 262 (1982), quoting *De Haan v. Winter,* 258 Mich. 293, 296, 241 N.W. 923 (1932). A plaintiff succeeds by setting forth allegations demonstrating that the defendant engaged in some arrangement or contrivance of an affirmative character designed to prevent subsequent discovery. *Id.*

When a defendant shares a fiduciary relationship with the plaintiff, nondisclosure of a material fact is enough to toll the statute of limitations. *Lumber Village Inc. v. Siegler*, 135 Mich. App. 685, 355 N.W.2d 654 (1984).

> As a general rule, for fraudulent concealment to postpone the running of the period of limitation, the fraud must be manifested by an affirmative act or misrepresentation. **An exception to this rule is that there is an affirmative duty to disclose where the parties are in a fiduciary relationship.**

Where a plaintiff is harmed directly due to breach of a fiduciary duty by a defendant or his agents, silence can be fraudulent. *Barrett v. Breault,* 275 Mich. App. 482, 267 N.W. 544, 546-48 (1936). This rule rests on the layperson's implicit confidence that the fiduciary will not harm them on purpose. *Id.* Michigan Supreme Court has held that the doctor-patient relationship creates this affirmative duty. *Kroll v. Vanden Berg*, 336 Mich 306, 57 N.W.2d 897, 899 (1953).

Furthermore, whether a fiduciary relationship exists, outside of well-defined categories (*e.g.*, trustee-beneficiary, attorney-client, etc.), is a question of fact for the jury. *Riverside Auto Sales, Inc. v. GE Capital Warranty Corp.*, No. 2:03 CV 55, 2004 WL 2106638, *7 (W.D. Mich. Mar. 30, 2004) (Quist, J.) (citing *In re Wood Estate*, 374 Mich. 278, 132 N.W.2d 35 (1965)). In those situations, the

fundamental tenet of a fiduciary relationship entails one party reposing faith, confidence, and trust in another's judgment and advice. *Muglia v. Kaumagraph Corp*., 64 F.3d 663 (6th Cir. Aug. 16, 1995).

MSU knowingly constructed a façade of legitimacy for Nassar, convincing victims that it was their discomfort—not Nassar's conduct—that was wrong.   In other words, MSU fraudulently concealed from plaintiffs the fact that they were injured in the first place. *Lutz v. Chesapeake Appalachia LLC*, 717 F.3d 459,475 (6th Cir. 2013) (adequately pleaded fraudulent concealment by alleging energy companies concealed miscalculation of royalty payments); *Venture Glob. Eng'g, LLC v. Satyam Computer Servs., Ltd*., 730 F.3d 580, 588 (6th Cir. 2013) (computer company concealed its own fraud); *State of Ohio ex rel. Fisher v. Louis Trauth Dairy, Inc*., 856 F. Supp. 1229, 1237 (S.D. Ohio 1994) (dairies concealed conspiracy to rig milk contract bidding system).

Furthermore, MSU fraudulently concealed from all of the plaintiffs its own role in their abuse. MSU concealed the fact that it knew Nassar was abusing and harassing students before plaintiffs were abused, yet failed to disclose or investigate the numerous complaints it had received—a failure that ensured that Nassar could continue to abuse students, including the plaintiffs.

Here, Plaintiffs have sufficiently pled that Defendant MSU and its employees, representatives and/or agents, including Defendants Strampel, Kovan, Dietzel, Lemmen, Klages, Tachnor-Hauk, Stollak and Moore failed to inform the plaintiffs of Nassar's misconduct as early as the late 1990s and fraudulently concealed the existence of claims and the identity of them as a liable party through affirmative actions. These factual allegations are sufficient to assert a claim that is timely under Section 5855 and support denial of Defendants' Motions to Dismiss on statute of limitations grounds.

Collectively the plaintiffs have alleged that Defendants had knowledge of Nassar's sexually inappropriate conduct and secreted that knowledge, thereby failing to warn and protect the young athletes from repeated, traumatic acts of sexual molestation. Plaintiffs complaints set forth how the Defendant MSU Individuals, as coaches, physicians, and trainers, held positions of high-regard and

respect over these young, impressionable women. When they received complaints of Nassar's misconduct, they used that position of authority to manipulate and quiet these women. This occurred in the late 1990's and continued in 2000, 2001 or 2002, 2004, and 2014. Defendants knew what Nassar was doing and remained silent. The MSU Defendants failed to notify their own member athletes or other young female athletes who were referred to Nassar while he was employed by MSU and to whom MSU owed a duty of protection.

By way of example, Plaintiffs' complaints allege that in 1997 and/or 1998, Larisse Boyce, an athlete notified Defendant MSU and Defendant Kathie Klages that Nassar sexually assaulted, her on multiple occasions. ECF 408, Page ID 7277, ¶125. Klages told this victim that she must be "misunderstanding" or "reading into" what Defendant Nassar was doing and went on to convince her not to file a formal complaint by explaining that it would have serious consequences for her and Defendant Nassar. ECF 408, PageID.7277. Defendant Klages' affirmative action of manipulating the minor victim from filing a formal complaint, as well as her inaction in reporting and investigating the girl's allegations constituted fraudulent concealment.

Similarly, in 2000, Tiffany Thomas Lopez, another student athlete reported to Lianna Hadden, Destiny Teachnor-Hauk, and MSU staff that Nassar touched her vaginal area and inserted his ungloved hand into her vagina as purported "treatment" for back pain. ECF 408, Page ID 7278, ¶130. Again, that victim was manipulated into silence and her allegations were secreted. ECF 408, Page ID 7278-7279 at ¶¶ 130-133. Teachnor-Hauk dissuaded her from reporting Nassar's conduct, telling her that pursuit of the matter would cast a burden on her family and cause the victim heartache and trauma. ECF 408, PageID.7278 at ¶135. Teachnor-Hauk shamed her into silence asking why she would want to drag Nassar through an allegation of sexual assault. ECF 408, PageID.7279 at ¶136.

Similarly, in 2001 or 2002, Jennifer Bedford, a volleyball player team reported to Lianna Hadden that Nassar sexually assaulted and abused her during "treatment." ECF 408, PageID.7279 at

¶138.  Ms. Hadden used her position of authority over Bedford to manipulate her, so she did not file a formal complaint against Nassar. *Id* at ¶140. In or around 2004, Defendants, including Defendant Gary Stollak, were notified that Nassar abused Kyle Stephens (approx. 11-12 year of age). *Id*. At ¶141.  Stollak did not report the abuse. Instead, he used his authority to convince the young victim and her parents to meet with Nassar and talk it out. ECF 408, PageID.7279-7280.

In 2014, additional complaints regarding Nassar's conduct surfaced after Amanda Thomashow was sexually abused by Nassar during a medical appointment. Nassar cupped her buttocks, massaged her breast and vaginal area, and became sexually aroused.  ECF 408, PageID.7280 at ¶147. Two of the "medical experts" consulted in this investigation were Lemmen and Teachnor-Hauk. ECF 408, PageID.7281 at ¶150.  By omitting critical information reported by the girl, MSU dismissed the complaint three months later as unsubstantiated, holding Nassar's conduct "medically appropriate" and "[n]ot of a sexual nature".  ECF 408, PageID.7280-7281 at ¶149.

As alleged, Defendants' actions go far beyond "failing to detect Nassar's wrongdoing or disclose it to the public" and "mere silence." Plaintiffs alleged a pattern and practice of manipulation and deception related to Nassar dating back years by individuals who held positions of authority over young, vulnerable women. Their conduct is reprehensible. Applying Rule 12(b)(6) standards, these allegations are sufficient to state a claim for fraudulent concealment under Michigan law. When there are disputed questions of fact, the court is unable to resolve the question of whether a cause of action is barred by a statute of limitation. *Colbert v. Conybeare Law Office*, 239 Mich. App. 608, 613–614 (2000).

## XII.   PLAINTIFFS' COMMON LAW CLAIMS ARE PROPERLY AND PLAUSIBLY PLED

Defendants also claim that Plaintiffs have not adequately pled common law claims. As set forth below, their arguments lack merit.

**A.      Plaintiffs Have Adequately Alleged Legal Duties for Negligence-Based Claims**

Defendants argue that the Plaintiffs have failed to state claims for negligence by failing to adequately allege legal duties owed by MSU. However, the Plaintiffs have adequately alleged relationships between the victims and Defendants under which legal duties arise under a host of different legal theories, including: premises liability, the duty to make reasonable efforts to expedite police involvement in response to the University's knowledge that Nassar posed a threat to commit foreseeable criminal acts against third parties like the victims, the doctrine of *in loco parentis*, special and fiduciary duties from the professional doctor-patient relationship, duties assumed by MSU's own policies and procedures on sexual misconduct, duties imposed by common law negligent retention, and duties imposed upon social hosts in situations where Nassar's victims were licensees at events.

Under Michigan law, there is no generalized duty to protect another who is endangered by a third person's conduct. *Murdock, supra* at 54. However, this duty *does* exist when a "special relationship" exists either between the defendant and the victim, *or* the defendant and the third party who caused the injury, i.e. Nassar. *Id*. The Plaintiffs have more than adequately alleged, *several* types of special relationships. A special relationship existed not only between MSU and Nassar, but *also* between MSU and the victims, Nassar and the victims, and between MSU, Nassar, and other Defendants such as USAG and Twistars.

A "special relationship" has been found in a host of relationships, including the following common relationships: invitor-invitee, common carrier-passenger, innkeeper-guest, landlord-tenant, employer-employee, and doctor-patient or psychiatrist-patient. *Id*. at 55, n. 11.  A host of those types of relationships apply to various Plaintiffs. For example, invitor-invitee duties would apply to Plaintiffs harmed on MSU's property. For the vast majority of the victims, though, at a minimum it is clear that there was a special relationship in the form of a doctor-patient relationship. There is

absolutely no doubt that the victims of Nassar all had a special relationship with Nassar *and* MSU by virtue of his professional doctor-patient relationship with them, alone. Each placed their trust and safety into his care, and the care of MSU.

Additionally, there can be no doubt that a special relationship existed between MSU and Nassar through the employment relationship. The employment relationship can form the basis for a special relationship that would impose a duty and liability upon MSU for Nassar's conduct. *Id*. at 55-56. Even *if* there was no special relationship directly between Nassar and his *victims*, MSU could still have legal duties through its employment of Nassar based upon MSU's duty not to hire or supervise personnel in a grossly negligent manner. *Id*. MSU was a hospital provider overseeing Nassar, and Michigan courts have explicitly stated that a hospital can be directly liable for negligent supervision of staff physicians as well as the selection and retention of medical staff. *Doe v. Borromeo*, 2012 Mich. App. LEXIS 1821, at *12 (Ct. App. Sep. 20, 2012); *Cox ex rel Cox v. Bd. of Hosp. Managers for City of Flint*, 467 Mich. 1, 11 (2002); *Theophelis v. Lansing Gen. Hosp.*, 430 Mich. 473, 478, n. 3 (1988).

In the context of negligent retention, an employer owes a duty to protect a third party from an employee if the employer knows or should have known of the existence of special circumstances regarding the employee's propensities to commit criminal or tortious acts. *Doe v. Borromeo*, at *14, citing *Hersh v. Kentfield Builders, Inc.*, 385 Mich. 410, 412 (1971). In *Borromeo*, a physician at a hospital sexually assaulted a young woman under the pretext of a medical examination. *Id*. at *1, 2. The court of appeals overturned the trial court that granted a motion to dismiss on the basis that the hospital owed no duty to protect the young girl, based upon allegations in the complaint that the hospital and its administrators were aware of special circumstances that put them on notice of the physician's propensity for inappropriate and illegal acts. *Id*. at *10-15. The court found in such a

situation, factual discovery was required in order to properly evaluate what knowledge the hospital had, and granting a motion to dismiss on the issue of duty was inappropriate.

Similarly, the Michigan Court of Appeals noted that a negligent supervision claim could be viable where an employee's supervisor had notice of an ongoing sexual assault. *Doe v. Doe*, Nos. 307420, 310019, 2019 Mich. App. LEXIS 2386, at *13 (Ct. App. Dec. 4, 2014). That case permitted a claim for failure to protect a victim of sexual assault when the defendant had a special relationship with her, based upon medical treatment provided to a young minor female who was sexually assaulted during an ambulance transport. *Id.*

MSU attempts to argue that even if a special relationship did exist, it still only had a duty to protect "those persons readily identifiable as foreseeably endangered[,]" citing *Murdock*, 559 N.W.2d at 643. However, all of the cases cited by MSU on foreseeability cite case law where courts have simply made clear the default rule that with *no* prior warning or some knowledge about the propensity of an employee to commit crimes or misconduct, it cannot be foreseeable for an employer to expect such acts or misconduct. Every Complaint before the Court involves a detailed accounting of similar victims complaining about Nassar's *identical* forms of misconduct being brought to MSU personnel's attention on dozens of occasions going back more than two decades.

Lastly, even *if* the law did not impose the legal duties already referenced, MSU voluntarily *assumed* various duties to the public and in relation to the victims by the nature of their policies and procedures, in which they assume the duty to root out and prevent sexual misconduct. A party is under a legal duty when it voluntarily assumes a function that it is not legally required to perform. *Estate of Qing Kong v. A.J. Marshall Co.*, 233 Mich. App. 229, 231 (1998). *Fultz v. Union-Commerce Assocs.*, 470 Mich. 460, 464 (2004). The Plaintiffs have alleged that MSU has extensive policies and procedures in place to voluntarily assume a duty to investigate and address instances of sexual assault or misconduct by its employees, and takes affirmative steps to assume that duty to benefit the public,

71

and individuals who participate in university programs, activities, or come upon the campus. By voluntarily assuming those duties, and negligently failing to supervise and investigate Nassar's misconduct, the Plaintiffs all have claims against MSU for their violation of an assumed duty.

### B.    Plaintiffs Have Pled Intentional Infliction of Emotional Distress

The MSU Defendants assert that Plaintiffs have not adequately pled intentional infliction of emotional distress because they have not alleged intentional and outrageous conduct by anyone other than Larry Nassar. However, this argument disregards substantial allegations in the complaints that MSU employees failed to report complaints of child sexual assault, lied to cover up Nassar's actions, discouraged victims from reporting their abuse, continued sending children to Nassar with knowledge that they would be abused, and more. These actions, taken as true and in the light most favorable to the Plaintiffs, plead a viable claim of IIED.

Under Michigan law, IIED claims require proof of four elements: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. MSU appears to take issue with the pleadings regarding only the first two elements. To be actionable, a defendant's conduct may either be "specifically intended to cause a plaintiff emotional distress" *or* "so reckless that any reasonable person would know that emotional distress would result." *Lewis v. Legrow*, 258 Mich. App. 175, 198 (2003). The conduct must be so outrageous and extreme that it went beyond the bounds of decency and would be "regarded as atrocious and utterly intolerable in a civilized community." *Linebaugh v. Sheraton Michigan Corp*, 198 Mich. App. 335, 342 (1993). The test for whether conduct is outrageous and extreme is whether an average member of the community, upon hearing the facts, would resent the actor and exclaim "outrageous!" Outrageous conduct may arise from the abuse of a position, relationship, or power to affect the victim's interests or where the actor proceeds in the face of knowledge that a person is particularly susceptible to emotional distress. Restatement (Second) of Torts, § 46, cmt. e, f.

72

In this matter, Plaintiffs have alleged that MSU and its employees: directed and referred girls as young as eight years old to a man they knew or suspected would sexually assault them; held Nassar out as a competent and ethical physician in furtherance of their own reputation, despite knowing that it would attract more girls to be abused; provided medical care through MSU's clinic that it knew was harmful and criminal; dissuaded victims of criminal sexual abuse from filing complaints using threats of serious repercussions or by misleading the victims to believe that the abuse was legitimate medical care; failed to investigate or report complaints of abuse to law enforcement, the victim's parents, or any other entity; required girls to receive "treatments" from Nassar in order to continue their athletic careers; covered up and/or lied about Nassar's actions and the existence of prior complaints; performed a facially deficient Title IX investigation and allowed Nassar to continue seeing patients while he was under investigation; failed to implement protective measures, supervise, or otherwise ensure that Nassar was not abusing patients; failed to warn patients of Nassar's conduct or the investigations into his conduct; failed to train its employees, representatives, and agents regarding preventative measures and the appropriate response to complaints of sexual abuse; and otherwise created a culture of indifference to sexual abuse that allowed Nassar's criminal actions to continue and flourish and caused Plaintiffs to believe they were powerless to stop their abuse. These allegations, taken as true, plainly amount to outrageous and intolerable conduct. The Plaintiffs have not alleged mere hurt feelings or inconsiderate or unkind actions. Plaintiffs have alleged abuses of position, abuses of relationships, and abuses of power by adults against young girls they knew were extremely vulnerable to emotional distress as a result of sexual assault. A reasonable juror could surely conclude that it is outrageous and intolerable for an adult who receives an abuse complaint from a child to do nothing or to actively cover up criminal activity.

Indeed, the MSU Defendants' conduct has been consistently condemned as outrageous and intolerable in modern society by members of the federal and state government, the media, MSU

faculty groups, students, and alumni, other members of the public, industry groups, and independent investigators. Investigations into MSU's actions have resulted in public censures and fines, including but not limited to a scathing report by the Michigan State Attorney General's Independent Special Counsel, a $4.5 million fine by the United States Department of Education, and an unsolicited admonishment of Kristine Moore's deficient 2014 investigation by the attorney grievance commission. Average members of the community, upon hearing the facts alleged in this matter, have thus consistently exclaimed "outrageous!" It cannot be held at this stage of litigation that Plaintiff's allegations do not amount to outrageous intentional conduct as a matter of law. Accordingly, the MSU Defendants' motion regarding this claim must be denied.

### C.    Plaintiffs Have Pled Negligent Infliction of Emotional Distress

The MSU Defendants argue that Plaintiffs have not adequately pled negligent infliction of emotional distress because Plaintiffs did not witness negligent injury to a third party. However, this argument is based on a misunderstanding of Michigan law, which recognizes direct and *sui generis* NIED claims in addition to bystander NIED claims. Plaintiffs have sufficiently pled NIED claims arising from the direct injuries to themselves caused by MSU and its employees.

In 1970, the Michigan Supreme Court recognized the direct NIED cause of action, stating:

> We hold that where a definite and objective physical injury is produced as a result of emotional distress proximately caused by defendant's negligent conduct, the plaintiff in a properly pleaded and proved action may recover in damages for such physical consequences to himself notwithstanding the absence of any physical impact upon plaintiff at the time of the mental shock.

*Daley v. La Croix*, 384 Mich. 4 (1970). In *Daley*, the defendant sheared off a utility pole near the plaintiffs' farm due to his negligent driving, causing an electrical explosion in the plaintiffs' home. The plaintiffs suffered emotional disturbance as a result of the explosion. They did not witness the crash or any injury to a third party, but the court nonetheless recognized their negligent infliction of

emotional distress claim. Michigan recognizes two other types of negligent infliction of emotional distress claims.

The Sixth Circuit and this Court have relied on *Daley* in recognizing direct NIED claims. In *Maldonado v. National Acme Co*, 73 F.3d 642, 645-646 (6th Cir. 1996), the Sixth Circuit upheld a direct NIED claim by a worker who was put in fear for his own safety when a machine malfunctioned, and a metal rod was thrown towards him. Plaintiffs who were exposed to toxic chemicals were allowed to proceed on NIED claims stemming from the fear that they would develop cancer that was caused by the defendant's negligence in *Stites v. Sundstrand Heat Transfer, Inc*, 660 F. Supp. 1516 (W.D. Mich. 1987). This Court also recognized the existence of direct NIED claims under Michigan law in *Willis v. U.S. Bank*, No. 2013 U.S. Dist. LEXIS 19843, *21 (W.D. Mich., Feb. 14, 2013) (Quist, J.).

*Daley* is binding caselaw that has never been overruled. Therefore, it must be applied by federal courts, which are tasked with applying the law the highest court of a state would apply if it were faced with the issue. *Standard Fire Ins Co. v. Ford Motor Co*., 723 F.3d 690, 692 (6th Cir. 2013).[43]

For these reasons, Plaintiffs' state a cognizable claim of negligent infliction of emotional distress. The MSU Defendants' motion must be denied as to the NIED claim.

**D.      Plaintiffs Have Adequately Pled Claims of Fraud and Misrepresentation**

The MSU Defendants allege that Plaintiffs have not sufficiently pled fraud and misrepresentation because (1) the particularity requirements have not been met; (2) no affirmative

---

[43] The opinions cited by the MSU Defendants which purportedly limit negligent infliction of emotional distress to only bystander claims are neither binding nor persuasive. *Duran v. Detroit News, Inc*. is a decision of the Michigan Court of Appeals, which lacks authority to overrule the Michigan Supreme Court. *Ratliff v. Gen. Motors Corp.*, 127 Mich. App. 410, 416 (1983) Likewise, *Gillespie v. City of Battle Creek*, 100 F.Supp 3d 623 (WD MI 2015), does not control as it conflicts with decisions of the Michigan highest courts and Sixth Circuit precedent.

misstatements have been alleged; and (3) no fiduciary relationship was alleged that would create a duty to disclose, relying on their arguments regarding fraudulent concealment. However, the Defendants' focus on fiduciary relationships is misplaced because Michigan law regarding silent fraud does not limit claims to that context.

Although fraud must be stated with particularity, see Fed. R. Civ. P. 9(b), this requirement does not abrogate the liberal notice pleading standards set forth in Fed. R. Civ. P. 8 and should not be taken as requiring highly detailed averments of evidentiary matters. *SEC v. Tiffany Industries, Inc*., 535 F. Supp. 1160, 1166 (E.D. Mo. 1982); *Brown v. Joiner Int'l Inc.*, 523 F. Supp. 333 (S.D. Ga. 1981). The purpose of Rule 9(b) is to prevent the unjustified injury of a defendant's reputation where there is no basis for a claim of fraud. *Lincoln Nat'l Bank v. Lampe*, 414 F. Supp. 1270, 1279 (N.D. Ill. 1976). The standard is met if the pleadings "provide[] the defendant with fair notice of the fraud which is claimed against him, and which evidence[] a reasonable belief on plaintiff's part that his claim has merit." *Rose v. Arkansas Valley Environmental Utility Authority*, 562 F. Supp. 1180, 1203 (W.D. Mis. 1983).

Since filing their original complaints, Plaintiffs have obtained additional facts which provide further support their allegations of fraud and misrepresentation. Plaintiffs are prepared to file amended complaints which provide more specific allegations of fraud, including the content of affirmative misstatements and the dates, speakers, recipients, and circumstances under which the statements were made. "Leave to amend should be freely granted, especially when dismissal is based on Rule 9(b)." *Galvin v McCarthy*, 545 F. Supp. 2d 1176 (D. Colo. 2008); *Anderson v. USAA Cas. Ins. Co.*, 221 F.R.D. 250, 253 (D.D.C. 2004) The appropriate remedy for failing to plead a fraud claim with particularly is not "the draconian measure of dismissing the claim," but rather is to require the plaintiff to file an amended complaint. *Rosengarten v. Buckley*, 565 F. Supp. 193, 196 (D. Md. 1982).

Additionally, Plaintiffs' claims of silent fraud do not require pleading the details of particular misstatements. The Defendants incorrectly argue that silent fraud claims are limited to a context where a fiduciary relationship exists.[44] While a duty to disclose certain facts may arise from a fiduciary relationship, Michigan law has consistently recognized that it arises in other contexts as well. Silence is actionable whenever the party is "in good faith duty-bound to disclose" a fact, "under circumstances where there was a legal duty of disclosure," "when fair dealing requires him to speak," or where "there was a legal or equitable duty of disclosure." *US Fidelity & Guaranty Co. v. Black*, 412 Mich. 99, 125 (1981); *M&D, Inc. v. McConkey*, 231 Mich. App. 22, 28-29, 31(1998).

Michigan courts have recognized that the requisite duty of disclosure could arise in many contexts not involving fiduciary relationships. See *Groening v. Opsata,* 323 Mich. 73 (1948) (seller of home and purchaser); *Nowicki v. Podgorski*, 359 Mich. 18 (1960) (seller of a business and purchaser); *Hord v. Environmental Research Inst.*, 463 Mich. 399 (2000) (employer and employee); *Abbo v. Wireless Toyz Francise, LLC*, 2014 Mich. App. LEXIS 846, *22 (May 13, 2014) (franchisor and franchisee). None of the cases cited herein hinged on or even analyzed whether a fiduciary relationship existed, and Defendants have not presented any law establishing that silent fraud can ***only*** arise in a fiduciary relationship. Accordingly, the MSU Defendants' argument regarding fiduciary duty does not provide a valid basis to dismiss the fraud claims against them.

The MSU Defendants' motion thus must be denied as to the fraud and misrepresentation claims.

---

[44] Notably, the MSU Defendants rely solely on their arguments concerning the fraudulent concealment tolling provision to assert that no claim for fraud has been pled, even though there is a distinction in the law between "what will establish a direct action for fraud and what constitutes fraudulent concealment for the purposes of tolling the running of a statutory period of limitation." *Lumber Village, Inc. v. Siegler*, 135 Mich App 685, 696 (1984). In addition, even fraudulent concealment is not limited to circumstances involving fiduciary relationships. *Id*. at 699 ("Unless there has been some fiduciary relationship ***or other direct dealings*** between the parties, mere silence is not enough to overcome the applicable period of limitation.")

E.   **Invasion of Privacy**

Michigan law recognizes a claim for invasion of privacy. "The tort of invasion of privacy is based on a common-law right to privacy, which is said to protect against four types of invasion of privacy: (1) intrusion upon the plaintiff's seclusion or solitude, or into his private affairs; (2) public disclosure of embarrassing private facts about the plaintiff; (3) publicity that places the plaintiff in a false light in the public eye; and (4) appropriation, for the defendant's advantage, of the plaintiff's name or likeness."   *Doe v. Mills,* 212 Mich. App. 73, 79-80, 536 N.W.2d 824 (1995).

Here, Plaintiffs asserted claims of invasions of privacy against Nassar and other MSU Defendants. As to Nassar, he is not a party to this motion and, in nearly all cases, has failed to answer or otherwise defend against Plaintiffs' allegations. As it pertains to his actions, these actions are properly pled and should not be dismissed. As to the remaining individual MSU Defendants, Plaintiffs have asserted an actionable cause of action. Michigan law recognizes a claim for invasion of privacy. Consequently, as to this claim Defendants' Motion to Dismiss should be denied and Plaintiffs should be entitled to factually develop this claim through the discovery process.

F.   **Vicarious Liability**

While it is generally acknowledged that a vicarious liability claim cannot exist for the actions of a governmental official based on Michigan's Governmental Tort Liability Act, it is important that each claim be considered substantively before the Court issues a carte blanche dismissal of these claims. It is the gravamen of the claim and not the title affixed to it that governs a plaintiff's claims. *Bryant v. Oakpointe Villa Nursing Centre*, 471 Mich. 411 (2004). For example, a litigant may title a claim as "vicarious liability" when the actual substance of the allegations asserted are more consistent with direct negligence or, in this case, 42 U.S.C. § 1983. Therefore, instead of a carte blanche dismissal of the "vicarious liability" counts, Plaintiffs suggest that those claims be dismissed without

prejudice. Such a dismissal will prevent a situation where collateral estoppel is later used against a plaintiff if the gravamen of the claim was something other than vicarious liability.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss should be denied.

PITT MCGEHEE PALMER & RIVERS

By: */s/Beth M. Rivers*
Michael L. Pitt (P24429)
Megan A. Bonanni (P52079)
Beth M. Rivers (P33614)
Peggy G. Pitt (P31407)
117 W. Fourth Street, Suite 200
Royal Oak, MI 48067
248-398-9800
brivers@pittlawpc.com
mpitt@pittlawpc.com
mbonanni@pittlawpc.com
ppitt@pittlawpc.com

*On Behalf of the Coalition for Plaintiffs*

Dated: November 6, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2019, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all attorneys of record.

By: */s/ Regina Bell*
Regina Bell

79